Kevin S. Reed (OBN #160574)
  ksreed@uoregon.edu
Douglas Y.S. Park (OBN #980904)
  dougpark@uoregon.edu
Jessica Price (OBN #182104) (*LR 83-4 pending*)
  jgprice@uoregon.edu
University of Oregon
Office of General Counsel
1226 University of Oregon
Eugene, OR  97403
Phone: (541) 346-3082

GIBSON, DUNN & CRUTCHER LLP

Theodore B. Olson (*pro hac vice forthcoming*)
  tolson@gibsondunn.com
Matthew D. McGill (*pro hac vice forthcoming*)
  mmcgill@gibsondunn.com
Joshua Wesneski (*pro hac vice forthcoming*)
  jwesneski@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Phone: (202) 955-8500

Alexander H. Southwell (*pro hac vice forthcoming*)
  asouthwell@gibsondunn.com
Oliver Fong (*pro hac vice forthcoming*)
  ofong@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

*Attorneys for Plaintiffs*

Rebecca Gose (OBN #105712)
  rebecca.gose@oregonstate.edu
Julie Penry (OBN #053440)
  julie.penry@oregonstate.edu
Whitney Hill (OBN #093849)
  whitney.hill@oregonstate.edu
(*Special Admission as Government Attorneys pending*)
Oregon State University
Office of the General Counsel
630 Kerr Admin Bldg
Corvallis, OR  97331
Phone: (541) 737-2474

GIBSON, DUNN & CRUTCHER LLP

Debra Wong Yang (*pro hac vice forthcoming*)
  dwongyang@gibsondunn.com
Ethan Dettmer (*pro hac vice forthcoming*)
  edettmer@gibsondunn.com
Theane Evangelis (*pro hac vice forthcoming*)
  tevangelis@gibsondunn.com
Chelsea Mae Thomas (*pro hac vice forthcoming*)
  cthomas@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Phone: (213) 229-7000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNIVERSITY OF OREGON; OREGON STATE UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; ARIZONA STATE UNIVERSITY; CALIFORNIA INSTITUTE OF TECHNOLOGY; CHAPMAN UNIVERSITY; CLAREMONT MCKENNA COLLEGE; NORTHERN | Case No.  6:20-cv-01127<br><br>COMPLAINT |

Complaint

ARIZONA UNIVERSITY; PITZER
COLLEGE; POMONA COLLEGE;
PRESIDENT AND BOARD OF TRUSTEES
OF SANTA CLARA COLLEGE; SCRIPPS
COLLEGE; SEATTLE UNIVERSITY;
STANFORD UNIVERSITY; SAINT
MARY'S COLLEGE OF CALIFORNIA;
UNIVERSITY OF ARIZONA; UNIVERSITY
OF THE PACIFIC; UNIVERSITY OF SAN
DIEGO; UNIVERSITY OF SAN
FRANCISCO; and UNIVERSITY OF UTAH,

                                 Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD F. WOLF, in his
official capacity as Acting Secretary of the
United States Department of Homeland
Security; and MATTHEW ALBENCE, in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement,

                                Defendants.

Complaint

## INTRODUCTION

1.      The United States has long welcomed international students through its F-1 visa program to attend school in the United States so long as they are engaged in a full course of study.  Since 2002, regulations implementing the F-1 visa program have required F-1 students to attend most classes in person.

2.      In January of 2020, the novel coronavirus began spreading throughout the United States, eventually leading in March 2020 to a near nationwide lockdown of businesses, churches, and schools.  The coronavirus causes the deadly disease COVID-19, which has infected millions of individuals in the United States and worldwide.

3.      In response to this growing pandemic and the practical reality that schools across the country were moving to remote education, U.S. Immigration and Customs Enforcement ("ICE") issued an order on March 9, 2020 advising that F-1 students would be exempt from the ordinary requirement that they attend the majority of their classes in person.  Instead, F-1 students would be permitted to attend their courses remotely without fear of losing their F-1 status or being deported.

4.      In reliance on that statement, schools, including Plaintiffs and others offering post-secondary education, began planning for the Fall 2020 semester.  As they deployed resources and evaluated the needs of their particular student bodies, universities and colleges commenced and devoted extensive efforts to outline plans for how they would offer effective academic instruction in a safe environment in the Fall.

5.      These schools began to adopt a variety of approaches—some schools planned to offer approximately half of their classes remotely and the other half in person, others planned for only a small number of in-person classes, and still others determined that it was best for their students to remain fully remote for the Fall 2020 semester.  These academic plans were the result

of extensive analysis, deliberation, and reasoned judgment by each school as to what best suited their particular circumstances.

6.      All of these plans, however, were thrown into disarray on July 6, 2020.  On that day, ICE issued a new order, largely rescinding its prior exemption for F-1 students and announcing that F-1 students in the United States would be *required* to attend classes in person or face removal to their home countries.  This announcement was made without warning and without any input from the schools or students directly affected by it.

7.      In addition to revoking the exemption for remote learning, ICE demanded that schools intending to offer purely online instruction submit an operational change plan by July 15—*just nine days later*—with other schools having until just August 1 to submit their plans. And all schools with F-1 students are required to submit new I-20 Forms for each of the thousands of F-1 students that have enrolled for the Fall semester.

8.      This about-face shook the entire academic community.  Schools that had spent months carefully planning for their Fall semester are suddenly faced with a need to completely redesign their academic programming for the Fall, or risk having their F-1 students expelled from the country for failing to attend in-person courses.  Moreover, instead of devoting resources to planning for the new semester or responding to the ever-evolving pandemic, schools with F-1 students will be forced to divert substantial resources to draft new operational plans on an expedited schedule, and issue new I-20 Forms for thousands of students—a burdensome, costly, and time-consuming process.

9.      F-1 students themselves are also in dire straits.  Those who are unable to enroll in in-person courses for the Fall face the threat of removal.  They may be sent back to a country with little or no Internet access, they may face new health or safety risks in that country, or they

may not even have a home to go back to. Once expelled, they may never be able to reapply for or reenter the F-1 program, thus permanently ending their post-secondary education.

10. Thousands of students are now subjected to these threats and living in fear of what might befall them. And the new rule does not give schools enough time to find ways to protect their international students from having their lives radically transformed by this new agency action.

11. Plaintiffs are a diverse coalition of post-secondary education institutions in the western states that refuse to tolerate ICE's unwarranted and unlawful action that threatens to disrupt the education of hundreds of thousands of hardworking students and their academic environments and missions. They bring this suit on their own behalf and on behalf of their students to vindicate their rights under the law to fair, reasoned, and transparent government action.

## PARTIES

12. Plaintiff University of Oregon is a public research university located in Eugene, Oregon. It provides instruction to more than 23,000 students annually, approximately 12% of which are international students. 1,635 active students hold F-1 visas. University of Oregon brings this lawsuit on behalf of itself and its F-1 visa-holding students.

13. Plaintiff Oregon State University is a public institution with physical campuses in Corvallis and Bend, Oregon, and educational sites in Newport and Portland, Oregon. It provides instruction to more than 30,000 students annually, approximately 11% of which are international students. Oregon State University anticipates that nearly 3,000 students holding F-1 visas will attend Oregon State University for the Fall 2020 semester, including 300 who are newly admitted students, some of whom are already in the United States. Oregon State University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

14.     Plaintiff University of Southern California ("USC") is a leading private research university located in Los Angeles, California.  It provides instruction to nearly 50,000 students annually from more than 135 countries, including approximately 11,500 active students holding F-1 visas.  USC brings this lawsuit on behalf of itself and its F-1 visa-holding students.

15.     Plaintiff Arizona State University is a public research university.  The majority of its students are enrolled in four campuses located in the Phoenix, Arizona metropolitan area, and the largest campus is in Tempe, Arizona.  In Fall 2019, the university enrolled approximately 10,000 degree-seeking undergraduate and graduate international students out of a total student body of over 75,000 students.  The Arizona Board of Regents for and on behalf of Arizona State University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

16.     Plaintiff California Institute of Technology is a private research university located in Pasadena, California.  It provides instruction to more than 2,200 students annually, including approximately 700 international students (or approximately 32% of its total student population).  California Institute of Technology brings this lawsuit on behalf of itself and its F-1 visa-holding students.

17.     Plaintiff Chapman University is a private university located in Orange, California.  It provides instruction to more than 9,000 students annually, including approximately 400 international students.  Chapman University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

18.     Plaintiff Claremont McKenna College is a private liberal arts college located in Claremont, California.   It provides instruction to approximately 1,300 students annually, including approximately 200 international students.  Claremont McKenna College brings this lawsuit on behalf of itself and its F-1 visa-holding students.

19.    Plaintiff Northern Arizona University is a public research university located in Flagstaff, Arizona.  It provides instruction to more than 30,000 students annually, including approximately 1,200 international students.  The Arizona Board of Regents for and on behalf of Northern Arizona University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

20.    Plaintiff Pitzer College is a private institution located in Claremont, California.  It provides instruction to approximately 1,100 students annually, approximately eight percent of which are international students. Pitzer College brings this lawsuit on behalf of itself and its F-1 visa-holding students.

21.    Plaintiff Pomona College is a private liberal arts college located in Claremont, California.  It provides instruction to more than 1,700 students annually, including approximately 208 active students holding F-1 visas and 52 newly admitted students who have not started their programs or F-1 visa status.  Typically, approximately 11% of Pomona College's student body is international students.  Pomona College brings this lawsuit on behalf of itself and its F-1 visa-holding students.

22.    Plaintiff President and Board of Trustees of Santa Clara College ("Santa Clara University") are representatives of a private Jesuit university located in Santa Clara, California. It provides instruction to more than 8,500 students annually, including more than 1,600 international students.  Santa Clara University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

23.    Plaintiffs Scripps College is a private women's college located in Claremont, California.  It provides instruction to approximately 1,150 students annually, approximately four

percent of which are international students.  Scripps College brings this lawsuit on behalf of itself and its F-1 visa-holding students.

24.     Plaintiff Seattle University is a private university located in Seattle, Washington. It provides instruction to more than 7,000 students annually, approximately 10% of which are international students.  Seattle University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

25.     Plaintiff Stanford University is a private research university located in Stanford, California.   It provides instruction to more than 17,000 students annually, including approximately 5,178 active students holding F-1 visas.   Typically, 11% of Stanford's undergraduate students and 34% of its graduate students are international students.  Collectively, the international students come from six continents and more than 101 countries.  Stanford University brings this lawsuit on behalf of itself and its F-1 visa-holding students.

26.     Plaintiff Saint Mary's College of California is a private college located in Moraga, California.  It provides instruction to more than 3,000 students annually, including 118 international students in the Fall 2019 semester.  Saint Mary's College of California brings this lawsuit on behalf of itself and its F-1 visa-holding students.

27.     Plaintiff University of Arizona is a public research university located in Tucson, Arizona.   It provides instruction to more than 45,000 students annually, including 3,780 international students in the Fall 2019 semester.   In the Spring 2020 semester, 3,382 active students held F-1 visas.  The Arizona Board of Regents for and on behalf of University of Arizona brings this lawsuit on behalf of itself and its F-1 visa-holding students.

28.     Plaintiff University of the Pacific is a private university located in Stockton, California.  It provides instruction to more than 6,000 students annually, including approximately

500 active students holding F-1 visas.  University of the Pacific brings this lawsuit on behalf of itself and its F-1 visa-holding students.

29.     Plaintiff University of San Diego is a private university located in San Diego, California.  It provides instruction to more than 9,000 students annually, including approximately 700 international students.  University of San Diego brings this lawsuit on behalf of itself and its F-1 visa-holding students.

30.     Plaintiff University of San Francisco is a private Jesuit university located in San Francisco, California.  It provides instruction to more than 10,000 students annually, including approximately 1,400 international students and 1,162 active students holding F-1 visas.  University of San Francisco brings this lawsuit on behalf of itself and its F-1 visa-holding students.

31.     Plaintiff University of Utah is a public research university located in Salt Lake City, Utah.   It provides instruction to more than 30,000 students annually, including approximately 2,700 active students holding F-1 visas.  University of Utah brings this lawsuit on behalf of itself and its F-1 visa-holding students.

32.     Defendant United States Department of Homeland Security is a federal agency of the United States.

33.     Defendant United States Immigration and Customs Enforcement is a division of the United States Department of Homeland Security.

34.     Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security.  He is sued in his official capacity.

35.     Defendant Matthew Albence is the Acting Director of United States Immigration and Customs Enforcement.  He is sued in his official capacity.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.  Plaintiffs have been legally wronged and are aggrieved by a final agency action promulgated by Defendants.  5 U.S.C. § 702.  Plaintiffs bring this suit under the Administrative Procedure Act for declaratory and injunctive relief to hold unlawful and set aside Defendants' action as contrary to law and arbitrary and capricious.  *Id.* §§ 705, 706.  Plaintiffs' claim presents a federal question.  28 U.S.C. § 1331.

37.     Sovereign immunity has been waived under 5 U.S.C. § 702.

38.     Venue is proper in this Court because this is an action against officers and agencies of the United States, and Plaintiffs University of Oregon and Oregon State University reside in this District and no real property is involved in the action.  28 U.S.C. § 1391(e)(1).  Venue is also proper in the Eugene Division because Plaintiffs University of Oregon and Oregon State University reside in this division.

39.     This Court is authorized to grant the requested injunctive relief pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705.

## FACTS

### A.     The F-1 Visa Program

40.     Citizens of foreign countries who wish to enter the United States to attend school must obtain a nonimmigrant F student visa.  See U.S. Department of State, *Student Visa*, Travel.State.Gov, https://bit.ly/2ZiwaN0.  In large part because of the F-1 visa program, which is the most common visa issued to international students, the United States has become the preeminent global hub for academic training.

41.     First, the student must apply and be accepted to a school certified by the SEVP, which is the Department of Homeland Security program that administers the Student and

Exchange Visitor Information System ("SEVIS") and "provides approval and oversight to schools authorized to enroll F . . . nonimmigrant students."  U.S. Immigration and Customs Enforcement, *SEVP Overview*, Student and Exchange Visitor Program, https://bit.ly/2Wbpdf0.

42.    "F-1" students are those international students enrolling in elementary, secondary, or post-secondary academic institutions.  U.S. Immigration and Customs Enforcement, *Student Process Steps: How to Navigate the U.S. Immigration System*, Student and Exchange Visitor Program, https://bit.ly/329dYHz.

43.    Once a student decides which school to attend, they must complete a Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," which is a paper record of the information in the SEVIS database and includes evidence of the student's financial ability to live and study in the United States.  *Id.*; *Student Visa*, *supra*; Department of Homeland Security, *Financial Ability*, Study in the States, https://bit.ly/2Cv4cod.  After the student completes the Form I-20, they must pay the I-901 SEVIS fee and apply for and receive a visa.  *Student Visa, supra*.

44.    Students with F-1 visas must maintain their status by taking and passing a full course of study.  Department of Homeland Security, *Maintaining Status*, Study in the States, https://bit.ly/32mi7bt.  For undergraduates, this typically means taking "at least 12 credit hours per term," while students in post-graduate programs "must take a full course of study as certified by the institution."  *Id.*; *see also* 8 C.F.R. § 214.2(f)(6)(i).  Ordinarily, "no more than the equivalent of one class or three credits per . . . term . . . may be counted toward the full course of study requirement if the class is taken on-line or through distance education and does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class."  *Id.* § 214.2(f)(6)(i)(G).  Students with F-1 visas are also eligible for

optional practical training, a "form of temporary employment that directly relates to [their] program of study, and curricular practical training, employment that is "an integral part of an established curriculum" that directly relates to students' major areas of study. *Maintaining Status, supra.*

45.    International students attending school through the F-1 program make up a significant part of the population of Plaintiffs' student body. Plaintiff University of Southern California ("USC"), for example, welcomed over 12,000 international students in the Fall 2019 term, over 25% of its total enrollment. Plaintiff The University of Oregon's student body typically consists of 11–12% international students, and 1,635 Oregon students currently hold F-1 visas. Plaintiff Oregon State University draws students from more than 100 countries and has been ranked as a top 1% global university by the Center for World University Rankings. Plaintiff Arizona State University had over 7,000 international students enrolled for the Fall 2020 semester as of July 9, and approximately 14,534 of its students hold F-1 visas. And these students are vital contributors to the success of the schools—these students bring intellectual and cultural diversity, engage in cutting edge research programs, participate in athletic programs, and help schools fulfill their missions to educate world leaders.

**B.    COVID-19 Strikes The United States**

46.    SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted. Everyone shares a risk of contracting the COVID-19 virus, and everyone who contracts it shares a risk of transmitting the virus to other people. People can carry and spread the virus even if they are asymptomatic or pre-symptomatic, although precisely how the virus spreads remains unknown. Testing or secluding those who are symptomatic is therefore an ineffective solution to preventing further spread of COVID-19.

47.     Contracting COVID-19 may cause serious health risks.  People who have COVID-19 can face shortness of breath, permanent neurologic damage, irreversible damage to their respiratory system, and death.

48.     There is no known vaccine against COVID-19 and no known medication to prevent infection.  The most effective measures to reduce the risk of contracting and spreading COVID-19 is to prevent infection and avoid community spread.  Such measures include avoiding close contact with other people by practicing appropriate social distancing, washing hands often, covering one's mouth and nose with cloth, and vigorously cleaning and disinfecting touched surfaces.

49.     The most likely means of transmitting the coronavirus that causes COVID-19 is through close human-to-human contact, especially indoors.  That is because the virus that causes COVID-19 mainly spreads through respiratory droplets produced when an infected person coughs, sneezes, or talks.  Emerging research indicates that the virus is easily transmitted in indoor spaces where too many people are enclosed for protracted periods, such as classrooms.

50.     The first confirmed case of COVID-19 was in the State of Washington in January 2020.  The virus spread rapidly across the country and caused shutdowns nationwide in an effort to contain the spread of this highly contagious disease.  Businesses and courthouses closed. International travel and domestic travel is restricted, and the State Department has urged "American students overseas" to "return to the United States as soon as possible" because of "unpredictable circumstances" and "[in]adequate health care" abroad.  U.S. Dep't of State, *COVID-19 Traveler Information* (last visited July 12, 2020), https://bit.ly/2ZkALy9.

51.     President Trump declared a national emergency in response to the COVID-19 pandemic on March 13, 2020.

52.     On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising people to adopt physical distancing measures, such as working from home, avoiding gatherings of more than 10 people, and limiting trips to grocery stores, bars, restaurants, and other areas where people share space.

53.     Following this advice, many states—including Oregon, California, and others—shut down some or all parts of ordinary life.  They issued orders suspending or severely curtailing the operation of non-essential schools, businesses, and other public spaces; limiting gatherings; and ordering citizens to wear face masks.  *See generally* Office of the Governor, State of Oregon, Exec. Order No. 20-30 (June 30, 2020), www.oregon.gov/gov/admin/Pages/eo_20-30.aspx.

54.     But the pandemic has not abated.  As of July 12th, there have been 3.1 million confirmed cases of COVID-19, which have caused 133,000 deaths.  CDC projects indicate that more than 200 million people in the United States could be infected with the coronavirus during the pandemic, with the most severe projections estimating as many as 1.5 million deaths.

**C.     ICE Responds To The Pandemic**

55.     In the wake of the COVID-19 outbreak, the federal government recognized that many universities could protect their students' health and safety only by teaching students remotely.

56.     On March 9, 2020, the SEVP division of ICE issued a guidance document acknowledging that "schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis."  Immigration & Customs Enforcement, Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students 1 (Mar. 9, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf.  ICE stated that it "intend[ed] to be

flexible with temporary adaptations" because the "COVID-19 crisis is fluid and rapidly changing." In particular, ICE "recognize[d] that schools are updating their emergency operations plans to minimize the potential impact of COVID-19 on the school," including by "provid[ing] online instruction."

57.    Four days later, on March 13, 2020, SEVP issued another guidance document to address the status of students whose schools "stop[ped] in-person classes" but would "offer[ ] online instructions." Immigration & Customs Enforcement, COVID-19: Guidance for SEVP Stakeholders 1 (Mar. 13, 2020), https://bit.ly/3focYTM. "Given the extraordinary nature of the COVID-19 emergency," ICE exempted F-1 visa holders from the rule that they must attend most classes in person. ICE directed students to "participate in online or other alternate learning procedures and remain in active status" with SEVP. As a result, students could retain their F-1 visa status while participating in remote learning implemented as a result of the pandemic.

58.    The March 13 guidance stated that it was a temporary provision that would remain "in effect for the duration of the emergency."

59.    The President's declaration of a national emergency has not been rescinded or terminated.

### D.    Plaintiffs Act Quickly To Protect Students

60.    As ICE and other government agencies responded to the pandemic, so did Plaintiffs.

61.    Several Plaintiffs organized emergency response teams to monitor the COVID-19 outbreak and advise on all aspects regarding Plaintiffs' response to the pandemic.

62.    These teams frequently consisted of a mixture of faculty, staff, and administrators for a variety of disciplines, and consulted as appropriate with student body representatives.

63.     These teams also drew on the expertise of local, state, and national global leaders in public health.  Those collaborative efforts included community-wide surveys, community events such as town halls and small group discussions, and frequent (often daily) meetings. Team members devoted several hours each week to Plaintiffs' respective COVID-19 responses.

64.     Beginning in early to the middle of March, Plaintiffs began transitioning to a remote curriculum to address the health risks associated with COVID-19.

65.     The Governors of Oregon, California, and other states ordered all universities closed in March as a response to the pandemic.

66.     By middle to late March, all Plaintiffs had transitioned to an entirely remote curriculum for the Spring 2020 semester.  In addition to complying with directives from state governors, these transitions were made for the purpose of helping protect Plaintiffs' students and communities from the spread of COVID-19 while still providing excellent education to their students.

67.     Throughout the Spring semester and into the summer, Plaintiffs continued to deliberate and consider how best to structure the Fall 2020 semester so as to maintain a safe environment while still providing students with a quality education.

68.     These deliberations took many months and consumed substantial resources at each of Plaintiffs, and were made with the input of numerous stakeholders and public health leaders.

69.     Plaintiffs undertook these deliberations and planning in part in reliance on the government's March 13 guidance, which confirmed that because of the pandemic students with F-1 visas would not be required to attend in-person classes to retain their visa status, and that the exemption for F-1 students would remain "in effect for the duration of the emergency."

70.    Throughout the summer, Plaintiffs began to announce to their respective student bodies how the Fall 2020 semester would be structured.  By way of example:

a.  Plaintiff The University of Oregon announced on June 17, 2020 that it would offer a hybrid of in-person and remote courses to its students during the Fall 2020 semester.  The University of Oregon also extended the commitment deadline for its admitted undergraduate students for the Fall 2020 semester to September 1, 2020.  The University of Oregon anticipates that its in-person classes in the Fall 2020 semester will cease on Wednesday November 25, 2020, with the remainder of the semester conducted remotely.

b.  Plaintiff Oregon State University announced on May 11, 2020 that it would offer a hybrid of in-person and remote courses to its students during the Fall 2020 semester.  Approximately 50% of the school's courses will be offered remotely, including most courses with enrollment over 50 students.  Oregon State University anticipated that its in-person classes in the Fall 2020 semester will cease on Thanksgiving, with the remainder of the semester conducted remotely.

c.  Plaintiff USC announced on July 8, 2020 that it would offer a hybrid of in-person and remote courses to its students during the Fall 2020 semester.  Approximately 10–20% of the school's classes—primarily small courses involving hands-on work—will be in person.

d.  Plaintiff Stanford University announced on June 3, 2020 that it would offer a hybrid of in-person and remote courses to its students during the Fall 2020 semester.  On June 28, Stanford further announced that its plan was to limit

the number of its undergraduate students invited to campus during each quarter to only two class cohorts (i.e., freshmen and sophomores are invited to campus for the Fall 2020 and Summer 2021 semesters, and juniors and seniors are invited to campus for the Winter and Spring 2021 semesters). Stanford will not *require* any of its students to return to campus for the Fall 2020 semester.

e. Plaintiff Pomona College announced on July 8, 2020 that it would not be able to bring any students back to campus for the Fall 2020 semester, instead offering a fully remote educational experience.

71.    At some Plaintiff schools, it may not be possible for some students to make sufficient academic progress toward their degrees without taking a fully remote schedule in the Fall semester.

**E.    ICE Reverses Course Without Warning**

72.    With no prior notice, ICE abruptly rescinded the March Order on July 6, 2020.

73.    In an order made public that day (the "July Order"), ICE directed that "Nonimmigrant F-1 . . . students attending schools operating entirely online may *not* take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the Fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States." Immigration & Customs Enforcement, Broadcast Message: COVID-19 and Fall 2020 1 (July 6, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

74.    The July Order ordered that "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to

a school with in-person instruction to remain in lawful status. If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."

75.    Moreover, the July Order directed that "[s]tudents attending schools offering a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," provided that for each such student, the school "certif[ies] to SEVP, through the Form I-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."  And "[i]f a school changes its operational stance mid-semester" and a student with an F-1 visa "switches to only online classes," those students "must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction."

76.    ICE also issued directives to schools.  "Schools that offer entirely online classes or programs or will not reopen for the Fall 2020 semester must complete an operational change plan and submit it to" SEVP "no later than Wednesday, July 15, 2020."  Schools who propose to provide a mix of online and in-person classes must update and submit "operations plans by August 1, 2020."  More critically, ICE's command to schools to update and reissue new Forms I-20 for each of their students on F-1 visas by August 4, 2020 is unduly burdensome.  It is also impossible if students are not registered for particular classes before the deadline.

77.    ICE provided a single sentence in the July Order to explain its change in policy: "There will still be accommodations to provide flexibility to schools and nonimmigrant students but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations."

78.     ICE has given no indication that, in promulgating the July Order, it considered how its action would impact the health of students, faculty, staff, or surrounding communities.

79.     ICE has given no indication that, in promulgating the July Order, it accounted for the reality that the COVID-19 pandemic—the reason ICE issued its March 9 and March 13 guidance documents—continues and is worsening to this day.

80.     ICE has given no indication that, in promulgating the July Order, it accounted for schools' and students' reliance on ICE's statements in the March 9 and March 13 guidance documents that the exemptions it announced were due to the COVID-19 pandemic and would be "in effect for the duration of the emergency."

81.     In the July Order, the Department of Homeland Security announced its "plans to publish the procedures and responsibilities described in [the Order] in the near future as a Temporary Final Rule in the Federal Register."  As of this filing—two days before some schools must take action based on the July Order—the Department of Homeland Security had not published such procedures and responsibilities in the Federal Register.

**F.     The Nation Responds To The July Order**

82.     The July Order was instantly met with widespread alarm and disapproval. Schools, students, academics, lawmakers, and many others immediately recognized the substantial harm the July Order would cause and rallied to voice their opposition to ICE's sudden turn.

83.     32 U.S. Senators and 67 Members of Congress sent ICE and DHS a letter urging the agency "to withdraw this proposed policy immediately, and not to proceed with [their] stated plans to publish it in the Federal Register as a Temporary Final Rule."  The lawmakers stated that "[t]he proposed policy throws the lives of hundreds of thousands of students, and the operations of hundreds of colleges and universities, into uncertainty just weeks before the start of

the Fall term, to the detriment of the United States and its institutions of higher education."  The
signatories agreed that the policy is "arbitrary" and "irrational," that "DHS and ICE released this
guidance as a pretext to force institutions of higher education to reopen," and that the
justification ICE has given for the policy is "an obvious pretext."  They noted a statement by
Acting Deputy Secretary of Homeland Security Ken Cuccinelli that the he believes the policy
will "encourage schools to reopen."  (*See* ¶ 145, *infra*.)  In reality, the lawmakers believed that
the July Order is "a cruel, senseless, and xenophobic attempt to … financially coerce colleges
and universities to reopen campuses this fall, despite what is best for public health," specifically
noting that the "policy is dangerous to the health and well-being of numerous communities" and
that it "demonstrates a callous disregard for the harm this policy inflicts on international
students, and is contrary to public health guidance from authorities within the Administration."
The letter expressly raised the "concern[] that ICE's guidance is motivated not by public health
considerations, but rather by animus toward immigrants, by a goal of forcing schools to reopen
even as COVID-19 cases are rising, and by a desire to create an illusion of normalcy during this
unprecedented public health emergency."

84.    A separate letter from Senator Susan Collins to the Acting Secretary of DHS
urged that the July Order "must be rescinded."  Senator Collins stated that the policy is "arbitrary
and capricious," "unfair and unrealistic," and that it "makes no sense" with respect to students
who are already in the U.S.  She further stated that "[i]t is hard for [her] to imagine a good reason
for this arbitrary requirement" and that the "arbitrary deadline [of July 15] seems intended to
force [Universities to make] a hasty decision to fully reopen for in-person instruction."  She
concluded that "the arbitrary and capricious [July 6] guidance will cause real, deep, and long-
lasting harm to these institutions and to our nation[al] interests."

85.    The Chief Executive Officer of the American Association for the Advancement of Science (AAAS), Sudip Parikh, issued a statement "urg[ing] the administration to reconsider and rescind this guidance." The AAAS stated that the July Order "is cruel to international students," "damaging to America's scientific leadership," and that it "will harm U.S. academia[.]" The AAAS is the world's largest general scientific society; it publishes *Science*, the leading American peer-reviewed general science journal.

86.    The President of the American Association of Universities (AAU), Mary Sue Coleman, issued a statement "strongly urg[ing] the administration to rescind th[e] guidance[.]" The Association stated that "the impact on international graduate students and undergraduate students already in the United States will be devastating, causing massive disruptions in their learning and research." It further stated the July Order "forces sudden, difficult decisions on international students and universities" and that it is "likely to do further damage to our nation's universities, which are already struggling with unprecedented uncertainty, massive logistical complications, and significant financial losses due to the ongoing COVID-19 pandemic." The AAU described the policy as "immensely misguided and deeply cruel[.]"

87.    The Executive Director of the Alliance of American College and University Presidents, Miriam Feldblum, issued a statement "call[ing] on ICE to reverse course … and for Congress … to direct the reversal of this problematic and harmful policy." The Alliance stated that the July Order "serves only to undermine international student[s] … and harm our nation's ability to attract and retain global talent." It also stated that "the forthcoming rule would unduly pressure colleges and universities—already experiencing historic fiscal strains and uncertainty—to prematurely open in-person courses or else risk losing invaluable international student enrollments and contributions."

88.     The Federation of Associations of Schools of the Health Professions wrote a letter "to strongly oppose" the July Order and "urg[ing] the administration to revoke this policy[.]" The Federation stated that the new policy "complicates decision-making for schools," "would create hardships both for faculty administration and students," and may "drive current students out and decrease the attractiveness of the United States as a destination for students and researchers." The letter further suggested that the policy creates "an inherent risk" to public health in forcing students to travel. The Federation comprises 18 associations that together represent 7,429 programs, institutions, hospitals, and health systems, and more than 1.3 million students, faculty, clinicians, administrators, residents, and researchers; it includes, for example, the Association of American Medical Colleges and the American Association of Colleges of Nursing.

89.     The President of Arizona State University, Michael M. Crow, issued a statement calling the July Order "a shocking, thoughtless and ill-considered attack against a key element of America's economic prowess." Dr. Crow called the Directive "extremely disruptive" to higher education and stated that it "would damage the American economy in a purely negative and chilling way," causing America to "relinquish [its] position of global leadership in teaching and learning."

90.     The President of Columbia University, Lee C. Bollinger, issued a statement addressed to the Columbia community, stating that the July Order "mark[s] a devastating reversal of federal policy," advancing a "destructive and indefensible purpose." The statement characterized the July Order as "deeply misguided," "destructive and indefensible," and notes that it will cause "damage to the nation's academic institutions" and "severely disrupt and cause enormous harm to the lives of the international students who are part of [the] Columbia family."

91.     The President of New York University, Andrew Hamilton, issued a statement addressed to NYU students, noting that the July Order "is just plain wrong and needlessly rigid" and stating that "NYU will be reaching out to Federal officials urging them to revoke or modify this rule."

92.     The President of Texas A&M University, Michael K. Young, issued a statement stating that the policy "could have a devastating impact on international students, as well as on our university campuses and communities."   The letter expressed support for the statement issued by the AAU opposing the policy, and expressed the President's "sincere[] hope that the guidance will be rescinded in light of the AAU statement and other similar reactions."

### G.     The July Order Negatively Affects Plaintiffs

93.     The concerns raised by these many public officials and other individuals are well founded.  If left undisturbed, the July Order will cause serious, irreparable harm to Plaintiffs in a number of ways.

94.     At the most immediate level, the July Order requires those Plaintiffs intending to offer only online courses in the Fall to submit an operational plan to ICE by July 15, just nine days after the issuance of the July Order.  That arbitrary and unreasonable deadline requires the diversion of substantial resources in order to attempt to meet it.

95.     The deadline of July 15 also requires Plaintiffs to decide definitively by that date *whether* they intend to offer only online courses, limiting their ability to be flexible as the semester approaches and as the situation regarding the pandemic continues to evolve.

96.     Likewise, the deadline of August 1 for all other Plaintiffs to submit operational plans similarly imposes harm, and requires those Plaintiffs to divert substantial resources that would better be used in planning for the upcoming academic year.

97.    The August 4 deadline for the submission of  I-20 Forms for *all* F-1 students similarly imposes an enormous administrative hurdle for schools during a time when administrators are devoting the majority of their time and effort to respond to the pandemic and plan for the Fall semester.

98.    The singular focus on issuing new I-20 Forms for all F-1 students will compromise the ability of Plaintiffs to provide ordinary services to international students, such as advising on coursework and cultural adjustments, clerical work, and urgent matters involving finances, housing and health.

99.    For those Plaintiffs that have extended their commitment date for admitted students beyond August 4, 2020, the requirement to issue a new Form I-20 for all F-1 students by August 4, 2020 is not only burdensome, but impossible to comply with.

100.    Moreover, the July Order forces Plaintiffs to reconsider and potentially redesign their carefully crafted Fall semester programs in an effort to ensure that F-1 students are able to take in-person courses and retain their F-1 visa status.  This "one-size-fits-all" approach impairs Plaintiffs' ability to structure their academic programs in the way they believe, after careful and extensive study and thought and in the exercise of their academic experience and judgment, best fits their respective student populations.

101.    Plaintiffs' redesign of their Fall semester programs will necessitate reengaging campus staff over numerous divisions, notwithstanding escalating health concerns in some areas.

102.    Because of how soon Plaintiffs must make arrangements for the Fall semester, some Plaintiffs may simply not be able to alter their Fall programs to accommodate all F-1 students enrolled.

103.    In the event of a significant community spread of COVID-19, the July Order may force schools to potentially choose between accommodating international students and complying with local public health directives.

104.    If Plaintiffs are unable to accommodate all of their F-1 students, they will suffer additional harm from the departure of those students.  The loss of those students may be permanent if they are later unable to return to the United States or if they elect to transfer to another school.

105.    F-1 students contribute to Plaintiffs' rich diversity through their participation in the collaborative learning environment, and their presence benefits domestic students and the Plaintiff schools as a whole.

106.    F-1 students also are involved in a cutting-edge research programs that make substantial contributions to society and elevate the reputation of Plaintiffs.

107.    F-1 students frequently act as teaching assistants for undergraduate students, and their departure would impair Plaintiffs' ability to provide the highest level of education for all of their students.

108.    Many F-1 students are also student athletes, and their departure from Plaintiffs would negatively affect Plaintiffs' athletic programs as well as their national reputation.

109.    F-1 students are critical to Plaintiffs' educational missions.  Schools help educate global citizens, many of whom take the best of America's values and principles back to their home countries as ambassadors.  And domestic students benefit when their schools attract other countries' best and brightest students to study with them.  Both international and domestic students benefit from sharing and learning about each other's experiences.

110.    In short, international students, including F-1 students, are a critical component of Plaintiffs' cultural and academic environments.  If any number of those students are forced to depart the United States because Plaintiffs are unable to offer them in-person courses, Plaintiffs will be unable to offer their students the same kind of diverse and engaging academic experience as they have in the past, and Plaintiffs' national and global standing as leading institutions of higher education will be diminished.

I.    **The July Order Negatively Affects F-1 Students**

111.    The July Order also harms the thousands of international students in the United States under F-1 visas whose lives have been thrust into uncertainty.

112.    For those F-1 students currently attending schools that will operate only online in the Fall, or whose schools will be unable to offer in-person classes for all international students, the July Order orders them to depart the United States unless they are able to find a suitable transfer school.

113.    Finding a school to transfer to that is offering in-person classes is a burdensome and uncertain process, and even if successful, those students who transfer will be deprived of their opportunity to learn at the school of their choice.

114.    F-1 students unable to take in-person classes who are forced to relocate due to the July Order will incur substantial harm and face numerous obstacles.

115.    F-1 students forced to depart will be required to uproot their entire lives, leaving behind their homes, their friends, and perhaps their education with just a few weeks' notice. These students will need to make immediate arrangements for housing in their home countries and will incur financial hardship in breaking their existing leases in the United States (or attempt to find sub-leases).  In addition to harming the F-1 students, this migration could also have

negative effects on the property owners who lease their properties to these students and local businesses who serve them.

116.    F-1 students departing the United States will be forced to do so at a time when international flights are expensive and direct flights are often unavailable, leading to even more financial hardship.

117.    If F-1 students' departures are not timely, they risk detention by immigration authorities and forced removal from the country that may bar their return to the United States for a decade.  8 U.S.C. § 1182(a)(9).

118.    Those F-1 students who are able to return home may face further obstacles, including limited or restricted Internet, limitations on electricity, and even lack of access to clean tap water.  It may also be difficult for F-1 students departing to countries several time zones away to attend live class sessions or to collaborate with colleagues.

119.    These challenges will be particularly acute for those F-1 students who intend to serve as teaching assistants for remote courses, and will be unable to fully assist teachers or students if access limitations in their home countries prevent them from doing so.

120.    For some students, they will be forced to return to countries where civil unrest and violence are ongoing, making remote learning virtually impossible.  Other countries may refuse or be unable to accommodate students' disabilities, or may be dangerous to some students due to their sexual orientation.

121.    Not all F-1 students even have a place to stay in their home country.  Some students are citizens of a country other than the one in which their family resides, and due to COVID-19 related travel restrictions, may have nowhere to go if removed from the United States.

122.    Because of these obstacles, some F-1 students will simply be unable to continue their education with Plaintiffs, and those who can will be disadvantaged relative to their peers.

123.    Departure from the United States—and from the F-1 program—can also have negative long-term consequences for F-1 students.

124.    For example, some F-1 students intend to pursue post-graduate employment opportunities through the option practical training program offered for F-1 students.  Those students, however, may be rendered ineligible for that program—temporarily or even permanently—if they are expelled from the F-1 program.

125.    The inability of these students to use their skills in the U.S. workforce harms not only them, but also the businesses and communities that would benefit from their employment and may be relying on them.

126.    Moreover, it may be difficult for F-1 students who depart the United States to later reenter the F-1 program.  U.S. consular offices are currently closed, and many countries have long waits for future visa appointments.  In addition, many students live significant distances from consular offices, and will be required to spend substantial sums of money in order to reinstate their visas.  These students will not only be delayed in completing their education, but may *never* be able to finish their studies at their chosen school.

127.    Some F-1 students already relocated abroad during the pandemic.  These students likewise face challenges in that they will be expelled from the F-1 visa program unless they attend a school that is *only* offering online courses or are willing and able to travel to the United States and attend in-person courses.  Transferring to such a school only weeks before the semester begins will be very difficult and likely impossible.

128.     Like other students forced to depart, these F-1 students who remain in their home countries will face serious challenges in reentering the F-1 visa program once expelled, and may never have an opportunity to complete their degrees.

129.     The July Order threatens to cause harm even for those F-1 students who *are* able to attend in-person courses in the United States.

130.     Some F-1 students are at special risk of contracting COVID-19, or have a heightened risk of serious illness from COVID-19, due to their particular medical conditions. Under the July Order, Plaintiffs will be unable to accommodate those students with a remote learning program, potentially threatening the safety of those more vulnerable students.

131.     Moreover, as noted above, because Plaintiffs will be forced to alter their academic programming to provide in-person classes for all F-1 students (if possible), students will be restricted in their choice of classes, and may be forced to take classes they neither want nor need.

132.     The challenges described above are not merely hypothetical, but are the reality facing many students affected by the July Order.  To provide just a few concrete examples of students' stories, with individual identifying information omitted due to students' concerns with privacy and retaliation:

133.     Student A is an international student from Iran studying computer science at Stanford.  She is openly queer / bisexual and does not wear a hijab.  Student A has also made political posts on her social media accounts and fears returning to Iran if Stanford is unable to offer in-person classes, as Iran may consider her activities "anti-Islamic Republic of Iran."  In addition, as a woman in Iran, she doubts she would be able to find work in computer science or engineering fields, and, given the existing travel ban on Iran, she does not know if she would ever be able to come back to the United States to finish her degree.

134.     Student B studies Political Science and International Relations at USC and is an international student from Tunisia.  They are currently in Tunisia and fear traveling back to the United States due to their compromised immune system and the risk of exposure to COVID-19, particularly as the only way back to the United States from Northern Africa would require connecting flights in Europe.  Due to Student B's health condition, becoming infected could be fatal, and they feel the July Order will force them to risk their life in order to continue their education.

135.     Student C is an international student from Greece studying Psychological Science at Pomona.  Both of their parents currently live in the United States, and if Student C is forced to return to Greece they would live alone, without any family.  As they are concerned Pomona may not offer in-person classes in the fall, the July Order has resulted in Student C considering transferring to a community college offering in-person classes to ensure they are able to stay in the United States.

136.     Student D is an international student from Hong Kong, obtaining a PhD at Stanford.  As a PhD student, Student D devotes the majority of their studies to research, and it is unclear to Student D if research will satisfy the in-person requirement.  Choosing an in-person class to attend would result in them signing up for a class that they do not need and are not interested in.  If the University were to stop providing in-person classes, it would not be possible for Student D to transfer to another university without abandoning their research and the funding that supports their education.

137.     Student E is an international student studying Political Science at USC. Currently, they live with two individuals who are both immunocompromised.  Student E fears attending in-person classes and risking exposure to COVID-19 which could then pass to these

people.  Returning home would separate them from their significant other and community, as well as disrupt their education and career prospects.

138.    Student F, a Germany international student, is working on a PhD at Stanford.  All of the classes they planned to take in pursuit of their degree will only be offered on-line, resulting in Student F signing up for unnecessary classes to make sure they can meet the "in-person" requirement.  Having recently signed a twelve-month lease, if Stanford stops offering in-person classes and Student F is forced to return to Germany, they would not only need to break their lease but also leave their significant other behind.  Further, Student F would not be able to continue their research while living abroad, and would not be able to maintain their stipend / TA salary, resulting in the loss of their only source of income.

139.    Student G is a rising senior studying Mathematical Economics at Pitzer College and is an international student from China.  Obtaining a flight to China can be difficult, as many flights have been cancelled, and Student G does not have the financial capability to purchase a ticket at this time given the soaring prices.  Removing Student G's F-1 status threatens their studies and jeopardizes their plans to take the GRE exam and apply for graduate school this year because doing so would be extremely difficult, if not impossible, in China.

140.    Student H is an international student from the United Kingdom studying math and computer science at Stanford.  Student H fears attending in-person classes as both she and her father, with whom Student H lives, have health conditions which place them at risk for significant complications if they are exposed to the coronavirus.  Student H also fears the July Order will force her to return to the United Kingdom if she does not attend in-person classes, increasing the risk of exposure to COVID-19 and separating Student H from her immunocompromised father.  The July Order has also resulted in a number of other Stanford

PhD candidates and post-doctorate students being unable to continue their programs as they are not able to return to Stanford for in-person classes. This will significantly impact Student H's research as she planned to collaborate with these individuals.

141.    Student I studies Psychology at Pitzer College and is an international student from China. Student I fears the July Order will force them to return to China and lose eligibility for OPT (a post-graduate work authorization program). In addition, the difficulty in obtaining a ticket to China, the cost of such a ticket, and the increased likelihood of exposure to COVID-19 during the trip makes returning home in the near future incredibly difficult and unsafe.

142.    Student J is a Chinese international student studying Humanities at Scripps College. As Scripps College will not be offering in-person classes in the fall, Student J is concerned the July Order will force them to return to China or face immigration consequences. The July Order also poses severe financial hardship on Student J and their family as obtaining a ticket for a flight back to China will cost nearly half of Student J's mother's yearly income. In addition, Student J would be forced into mandatory quarantine by the Chinese government for 14 days upon return.

143.    Student K is an international student from Nepal studying Political Economy at Stanford. As an F-1 visa holder, Student K is working toward their dissertation while helping teach undergraduate courses at Stanford. If Stanford is unable to provide in-person classes, they will not be able to return to their home country, as international flights to Nepal are currently disallowed. Even if Student K were somehow able to return to Nepal, they would be unable to conduct their research or perform their teaching duties, severely impacting their education and dissertation progress.

144.    Student L is an international student from India studying with the International Dental Studies Program at the University of the Pacific.  If forced to return to their home country, Student L would not be able to obtain the patient care experience required for students in this program to obtain their degree.  This would result in significant financial and emotional stress to them and their family, which is dependent on Student L to provide for them after obtaining a degree.

## CLAIMS FOR RELIEF

### Count I:  Violation of the Administrative Procedure Act

**The July Order Is Arbitrary And Capricious
Because It Is Not The Product Of Reasoned Decisionmaking**

145.    Plaintiffs incorporate the preceding paragraphs by reference.

146.    The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

147.    Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

148.    If an agency changes an existing policy, it must "display awareness that it *is* changing position" and "must show that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

149.    The July Order offers a single sentence of explanation: "There will still be accommodations to provide flexibility to schools and nonimmigrant students but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations."  This explanation does not identify

what the purported "carefully balanced protections" are, does not explain how or why those protections favor reversing ICE's previous policy determinations, and does not explain why the original rationale supporting the March guidance—the need for an exemption in light of the "extraordinary nature of the COVID-19 emergency"—no longer supported Defendants' March guidance. For this reason, Defendants' July Order violates the APA.

150.    An agency must also "pay[ ] attention to the advantages *and* the disadvantages of agency decision." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). When an agency issues a new policy, it must take into account "serious reliance interests" engendered by the previous policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Agency action must therefore be vacated if the agency "failed to address whether there was 'legitimate reliance'" on an earlier policy. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

151.    The July Order is arbitrary and capricious because it failed to account for or address legitimate reliance interests engendered by Defendants' March guidance, which acknowledged that universities and colleges could provide online education to adapt to the significant public health concerns associated with the COVID-19 virus, exempted students with F-1 visas from regulatory in-person class requirements, and confirmed that this flexible guidance would be "in effect for the duration of the emergency." Moreover, universities and schools had invested substantial resources to develop Fall 2020 academic plans that carefully balanced the health, safety, and educational needs of faculty, students, and staff. These plans were thrown into disarray by the July Order, and Plaintiffs were forced to divert resources to respond to the deadlines and burdens the July Order imposed.

## Count II:  Violation of the Administrative Procedure Act

### The July Order Is Arbitrary And Capricious
### Because Its Proffered Reasons Are Pretextual

152.    Plaintiffs incorporate the preceding paragraphs by reference.

153.    The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

154.    Agency action cannot lawfully rest on a "pretextual basis."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).  The July Order is arbitrary and capricious because it rests on a pretextual basis.

155.    In the July Order, Defendants stated that its policy reversal was necessary to "resume the carefully balanced protections implemented by federal regulations."

156.    That is not the true rationale for the policy change.

157.    Instead, Defendants' rationale was to encourage and coerce schools to reopen. Defendants have not tried to hide this rationale.  Acting Deputy Secretary of Homeland Security Ken Cuccinelli said in a public interview that the July Order's purpose was to "encourage schools to reopen."  John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will "Encourage Schools to Reopen,"* The Hill (July 7, 2020), https://bit.ly/303vFG2.  Additionally, the President has repeatedly demanded that schools reopen in the Fall and has often accompanied such demands with threats to cut off federal funding.  *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (July 10, 2020, 7:41 AM) (. . . Schools must be open in the Fall.  If not open, why would the Federal Government give Funding?  It won't!!!"); Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM) ("SCHOOLS MUST OPEN IN THE FALL!!!").

158.   For this reason, the July Order must be held unlawful, vacated, and set aside as arbitrary, capricious, an abuse of discretion, or not in accordance with law.   5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

159.   Declare that the July Order violates the APA;

160.   Vacate and set aside the July Order;

161.   Reinstate the March 13 Guidance;

162.   Enter a temporary restraining order preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving effect to the July Order or the policy announced in the July Order;

163.   Enter a preliminary injunction preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving effect to the July Order or the policy announced in the July Order;

164.   Enter a permanent injunction preventing Defendants and all persons acting in concert with them from enforcing, implementing, and giving effect to the July Order or the policy announced in the July Order;

165.   Issue all process necessary and appropriate to postpone the effective date of the July Order and the policy announced in the July Order and to maintain the status quo pending the conclusion of this case;

166.   Award Plaintiffs their reasonable costs and attorneys' fees; and

167.   Award any and all other relief as this Court may deem just and appropriate.

DATED:  July 13, 2020

GIBSON, DUNN & CRUTCHER LLP

Debra Wong Yang (*pro hac vice forthcoming*)
  dwongyang@gibsondunn.com
Ethan Dettmer (*pro hac vice forthcoming*)
  edettmer@gibsondunn.com
Theane Evangelis (*pro hac vice forthcoming*)
  tevangelis@gibsondunn.com
Chelsea Mae Thomas (*pro hac vice forthcoming*)
  cthomas@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Phone: (213) 229-7000

Theodore B. Olson (*pro hac vice forthcoming*)
  tolson@gibsondunn.com
Matthew D. McGill (*pro hac vice forthcoming*)
  mmcgill@gibsondunn.com
Joshua Wesneski (*pro hac vice forthcoming*)
  jwesneski@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Phone: (202) 955-8500

Alexander H. Southwell (*pro hac vice forthcoming*)
  asouthwell@gibsondunn.com
Oliver Fong (*pro hac vice forthcoming*)
  ofong@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

*Attorneys for Plaintiffs*

  /s/ *Kevin S. Reed*

Kevin S. Reed (OBN #160574)
  ksreed@uoregon.edu
Douglas Y.S. Park (OBN #980904)
  dougpark@uoregon.edu
Jessica Price (OBN #182104) (*LR 83-4 pending*)
  jgprice@uoregon.edu
University of Oregon
Office of General Counsel
1226 University of Oregon
Eugene, OR  97403
Phone: (541) 346-3082

Rebecca Gose (OBN #105712)
  rebecca.gose@oregonstate.edu
Julie Penry (OBN #053440)
  julie.penry@oregonstate.edu
Whitney Hill (OBN 093849)
  whitney.hill@oregonstate.edu
(*Special Admission as Government Attorneys pending*)
Oregon State University
Office of the General Counsel
630 Kerr Admin Bldg
Corvallis, OR  97331
Phone: (541) 737-2474

Beong-Soo Kim (Cal. BN 212912) (*pro hac vice forthcoming*)
  bkim@usc.edu
Laurie Barnes (Cal. BN 229038) (*pro hac vice forthcoming*)
  lbarnes@usc.edu
Andreas Meyer (Cal. BN 267151) (*pro hac vice forthcoming*)
  andreasm@usc.edu
University of Southern California
Office of the General Counsel
3551 Trousdale Parkway, ADM 352
Los Angeles, CA  90089-5013

*Attorneys for Plaintiffs*