Kevin S. Reed (OBN #160574)
  ksreed@uoregon.edu
Douglas Y.S. Park (OBN #980904)
  dougpark@uoregon.edu
Jessica Price (OBN #182104) (*LR 83-4 pending*)
  jgprice@uoregon.edu
University of Oregon
Office of General Counsel
1226 University of Oregon
Eugene, OR 97403
Phone: (541) 346-3082

GIBSON, DUNN & CRUTCHER LLP

Theodore B. Olson (*pro hac vice forthcoming*)
  tolson@gibsondunn.com
Matthew D. McGill (*pro hac vice forthcoming*)
  mmcgill@gibsondunn.com
Joshua Wesneski (*pro hac vice forthcoming*)
  jwesneski@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Phone: (202) 955-8500

Alexander H. Southwell (*pro hac vice forthcoming*)
  asouthwell@gibsondunn.com
Oliver Fong (*pro hac vice forthcoming*)
  ofong@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-4000

*Attorneys for Plaintiffs*

Rebecca Gose (OBN #105712)
  rebecca.gose@oregonstate.edu
Julie Penry (OBN #053440)
  julie.penry@oregonstate.edu
Whitney Hill (OBN #093849)
  whitney.hill@oregonstate.edu
(*Special Admission as Government Attorneys pending*)
Oregon State University
Office of the General Counsel
630 Kerr Admin Bldg
Corvallis, OR 97331
Phone: (541) 737-2474

GIBSON, DUNN & CRUTCHER LLP

Debra Wong Yang (*pro hac vice forthcoming*)
  dwongyang@gibsondunn.com
Ethan Dettmer (*pro hac vice forthcoming*)
  edettmer@gibsondunn.com
Theane Evangelis (*pro hac vice forthcoming*)
  tevangelis@gibsondunn.com
Chelsea Mae Thomas (*pro hac vice forthcoming*)
  cthomas@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: (213) 229-7000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNIVERSITY OF OREGON; OREGON STATE UNIVERSITY; UNIVERSITY OF SOUTHERN CALIFORNIA; ARIZONA STATE UNIVERSITY; CALIFORNIA INSTITUTE OF TECHNOLOGY; CHAPMAN UNIVERSITY; CLAREMONT MCKENNA COLLEGE; NORTHERN ARIZONA UNIVERSITY; PITZER | Case No. 6:20-cv-01127-MK<br><br>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>REQUEST FOR EXPEDITED HEARING |

COLLEGE; POMONA COLLEGE;
PRESIDENT AND BOARD OF TRUSTEES
OF SANTA CLARA COLLEGE; SCRIPPS
COLLEGE; SEATTLE UNIVERSITY;
STANFORD UNIVERSITY; SAINT
MARY'S COLLEGE OF CALIFORNIA;
UNIVERSITY OF ARIZONA; UNIVERSITY
OF THE PACIFIC; UNIVERSITY OF SAN
DIEGO; UNIVERSITY OF SAN
FRANCISCO; and UNIVERSITY OF UTAH,

REQUEST FOR ORAL ARGUMENT

                                    Plaintiffs,

         v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD F. WOLF, in his
official capacity as Acting Secretary of the
United States Department of Homeland
Security; and MATTHEW ALBENCE, in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement,

                                    Defendants.

Plaintiffs' Motion for Summary Judgment

# TABLE OF CONTENTS

LR 7-1(A) CONFERRAL CERTIFICATION................................................................. 1

MOTION ……........................................................................................................... 1

INTRODUCTION ....................................................................................................... 2

BACKGROUND .......................................................................................................... 6

    I. The F-1 Visa Program ........................................................................................ 6

    II.     Initial Response to COVID-19.................................................................. 8

           A.     The March Order.................................................................... 9

           B.     Plaintiffs' COVID-19 Response ........................................ 10

    III.     The July Order And Its Effects ............................................................. 12

           A.     ICE Reverses Course ......................................................... 12

           B.     The Fallout From ICE's Reversal ...................................... 13

LEGAL STANDARD.................................................................................................. 14

ARGUMENT .............................................................................................................. 14

    I.     The July Order Is Final Agency Action ................................................ 15

    II.     The July Order Is Not The Product Of Reasoned Decision Making ................. 15

           A.     ICE Failed To Consider The Harms Arising Out Of The July Order ...... 15

           B.     The July Order Offers No Reasoned Explanation At All ........................ 25

    III.     The Proffered Reasons For The July Order Are Pretextual................................ 27

CONCLUSION............................................................................................................ 29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arrington v. Daniels*,
　516 F.3d 1106 (9th Cir. 2008) .............................................................25

*Bennett v. Spear*,
　520 U.S. 154 (1997).............................................................................15

*Burlington Truck Lines, Inc. v. United States*,
　371 U.S. 156 (1962).......................................................................25, 28

*Dep't of Commerce v. New York*,
　139 S. Ct. 2551 (2019)...................................................................28, 29

*Department of Homeland Security v. Regents of the University of California*,
　140 S. Ct. 1891 (2020)...................................................................16, 27

*Encino Motorcars, LLC v. Navarro*,
　136 S. Ct. 2117 (2016)........................................................................15

*FCC v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009).............................................................................25

*Fisher v. Univ. of Tex. at Austin*,
　136 S. Ct. 2198 (2016)..........................................................................2

*Grutter v. Bollinger*,
　539 U.S. 306 (2003).............................................................................20

*Michigan v. EPA*,
　135 S. Ct. 2699 (2015)........................................................................15

*Morales-Izquierdo v. Gonzales*,
　486 F.3d 484 (9th Cir. 2007) ..............................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983)...............................................................................15

*Nat'l Ass'n of Mfrs. v. SEC*,
　800 F.3d 518 (D.C. Cir. 2015) ............................................................29

*Sackett v. EPA*,
　566 U.S. 120 (2012).............................................................................15

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996)..................................................................................16

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................14

8 U.S.C. § 1101(a)(15)(F)(i) ...........................................................................2

**Other Authorities**

*ASU Is the Top Public University of Choice for International Students*, Ariz. State
    Univ. (Nov. 13, 2018), https://bit.ly/2CsTEGj ...........................................8

*Coronavirus Disease 2019 (COVID-19), Cases in the US*, Ctrs. For Disease
    Control & Prevention (last visited July 11, 2020), https://bit.ly/301213T ...........26

*Coronavirus Disease 2019 (COVID-19), People With Certain Medical
    Conditions*, Ctrs. for Disease Control & Prevention (June 25, 2020),
    https://bit.ly/3gO6spB..........................................................................21

Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19):
    Cases in the US* (last visited July 12, 2020), https://bit.ly/2SyyE6k ...................9

Department of Homeland Security, *Financial Ability*, Study in the States,
    https://bit.ly/2Cv4cod..........................................................................7

Department of Homeland Security, *Maintaining Status*, Study in the States,
    https://bit.ly/32mi7bt.........................................................................7, 8

*Frequently Asked Questions for SEVP Stakeholders About Guidance for the Fall
    2020 Semester*, U.S. Immigration & Customs Enforcement (July 7, 2020),
    https://bit.ly/3fkAIYN....................................................................22, 23, 27

John Bowden, *Cuccinelli Says Rule Forcing International Students to Return
    Home Will "Encourage Schools to Reopen"*, The Hill (July 7, 2020) .................1, 3, 6, 8

President Donald J. Trump, *Proclamation on Declaring a National Emergency
    Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13,
    2020), https://bit.ly/3ffGlaK ..................................................................26

*Rate of Positive Tests in the US and States Over Time*, Johns Hopkins Univ. of
    Med. (last visited July 11, 2020), https://bit.ly/301h4uE.................................26

U.S. Dep't of State, *Student Visa*, Travel.State.Gov, https://bit.ly/2ZiwaN0 ...............6, 7

U.S. Immigration and Customs Enforcement, *SEVP Overview*, Student and
    Exchange Visitor Program, https://bit.ly/2Wbpdf0 .......................................7

U.S. Immigration and Customs Enforcement, *Student Process Steps: How to Navigate the U.S. Immigration System*, Student and Exchange Visitor Program, https://bit.ly/329dYHz ................................................................................. 7

U.S. Dep't of State, *COVID-19 Traveler Information* (last visited July 12, 2020), https://bit.ly/2ZkALy9 ..................................................................................... 9

White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/35x86aT ..................................................................................... 9

**Regulations**

8 C.F.R. § 214.2(f)(6)(i) ................................................................................................ 7

8 C.F.R. § 214.2(f)(6)(i)(G) ..................................................................................... 2, 8

8 C.F.R. § 214.2(f)(10) ............................................................................................. 23

8 C.F.R. § 214.2(f)(10)(ii)(A)(3) ............................................................................. 24

## LR 7-1(A) CONFERRAL CERTIFICATION

In compliance with Local Rule 7-1(a), undersigned counsel have made reasonable efforts to confer with defendants to resolve the dispute presented in this motion but have been unable to do so.

## MOTION

Plaintiffs are a diverse coalition of 20 institutions of higher education located in Oregon, Arizona, California, Utah, and Washington.   Plaintiffs include both public and private post-secondary-education schools ranging from large research institutions to small liberal arts colleges.   One thing all Plaintiffs have in common is that they have substantial numbers of international students who are vital to the fabric of their institutions.  Collectively, Plaintiffs have over 50,000 enrolled international students.  Plaintiffs file this combined motion for summary judgment that finds unlawful an order of July 6, 2020 issued by U.S. Immigration and Customs Enforcement ("ICE") through the Student and Exchange Visitor Program ("SEVP") that rescinds guidance ICE issued on March 9, 2020 and March 13, 2020 and requires international students with F-1 status in the United States to attend in-person classes in order to retain their "Active" status (the "July Order").   In a nationally televised interview, Acting Deputy Secretary of Homeland Security Ken Cuccinelli trumpeted that the July Order would "encourage schools to reopen."  John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will "Encourage Schools to Reopen"*, The Hill (July 7, 2020), https://bit.ly/303vFG2.  Because the July Order violates the Administrative Procedure Act ("APA"), Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs attract students from around the world, from nearly every country on the planet. These international students are integral parts of Plaintiffs' institutions. They include brilliant research scientists, engaging teachers, world-class athletes, and countless students who each contributes a unique perspective in their academic and local community—a perspective that the Supreme Court has recognized as a critically important component in a modern education that "promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210 (2016) (quotation marks omitted). Indeed, for many of Plaintiffs' American students, their international classmates present their first opportunity to meaningfully connect with other cultures. Enrollment of international students accordingly is critical to the fulfillment of Plaintiffs' educational missions.

For decades, the United States has welcomed international students through its F-1 visa program, under which international students may enter the United States on a nonimmigrant basis and remain here so long as they are engaged in a "full course of study." 8 U.S.C. § 1101(a)(15)(F)(i). In 2002, as online degree programs became more widely available, ICE's predecessor agency issued a regulation interpreting a "full course of study" to require the student to attend most classes in person; students enrolled in online degree programs were not eligible for F-1 visas. 8 C.F.R. § 214.2(f)(6)(i)(G).

The COVID-19 pandemic strained that regulatory framework as colleges and universities across the country were forced to close their campuses mid-semester and shift their instruction entirely to online platforms to protect the health and safety of their campus communities. To its credit, ICE responded to the public health emergency with flexibility, issuing guidance on March 13 providing that F-1 students could maintain their Active status while attending classes online. This allowed international students to continue their education either from the United States or

from their home countries.  The March 13 guidance recognized "the extraordinary nature of the COVID-19 emergency" and, critically for schools needing to design new educational environments for the fall semester, stated this accommodation would remain "in effect for the duration of the emergency."  Southwell Decl. Ex. B, at 1.

In the ensuing months, Plaintiffs have worked tirelessly to develop their plans for the fall semester.  Relying on ICE's March guidance that it would remain "flexible with temporary adaptations" as schools "address the significant public health concerns associated with the COVID-19 crisis," Southwell Decl. Ex. B, at 1, many are preparing a "hybrid" approach in which institutions will offer various combinations of in-person and online instruction, depending on the state of the pandemic in the fall.  Others, however, have concluded they cannot now safely reopen their campuses given their locations and resources, and accordingly will be offering instruction only online in the fall semester.  Others are continuing to monitor the rapidly evolving public health situation before deciding on a plan.

The Department of Homeland Security and ICE apparently disapprove of this state of affairs and determined that Plaintiffs and other colleges and universities were in need of further "encourage[ment] . . . to reopen."  Bowden, *supra*.  On July 6, with the COVID-19 pandemic raging through Arizona, California, and other western states, ICE issued the July Order, rescinding the March guidance and dictating instead that "[s]tudents attending schools operating entirely online may not take a full online course load and remain in the United States."  Southwell Decl. Ex. C, at 1.  Students attending schools utilizing a "hybrid model" also may not take "an entirely online course load for the fall 2020 semester" and remain in the United States.  *Id.*

As for the many F-1 students who, amidst the pandemic, returned to their home countries, the July Order said that they could continue their education through online classes and maintain their F-1 "Active status," but only if online courses are "the only choice offered by the school." Southwell Decl. Ex. C, at 2. The July Order thus seems to say that if an F-1 student now abroad is enrolled at a school with a hybrid program, she can maintain Active F-1 status only if she returns to the United States and takes in-person classes—even if travel to the United States is (as it is for many) impermissible (because of travel bans), infeasible (because of lack of commercial flights), or inadvisable (because a deadly pandemic currently is gripping much of the United States).

Plaintiffs are scrambling to respond to the July Order. Those schools intending to offer instruction only online in the fall were given just *nine days* to draft and submit an operational plan to ICE, with schools committing to a hybrid or full reopening plan afforded an additional two weeks. Meanwhile, Plaintiffs must begin the enormously burdensome process of reissuing Forms I-20 to each of the thousands of international students that attend their schools—a task that is flatly impossible for those schools that have not yet completed enrollment for the fall semester.

But ICE's new rule cuts even more deeply into Plaintiffs' educational prerogatives and core missions. In order to protect their international students from imminent deportation, Plaintiffs are racing to reconfigure their carefully crafted plans for the fall semester to create additional in-person classes for no reason other than to ensure that each F-1 student can remain in compliance with the July Order and still make meaningful academic progress. The July Order thus not only requires Plaintiffs to rearrange their fall course offerings, teaching schedules, room

locations, student accommodations, and facilities management, but by dictating changes to Plaintiffs' course offerings, it is tampering directly with Plaintiffs' educational missions.

The situation for Plaintiffs' international students is even more dire. For those enrolled in schools with "hybrid" reopening plans, they now must realign their course work to take in-person classes that may have no relationship to their academic major or course of study. But the situation is much worse for those students who attend schools offering only online courses for the fall and cannot find alternative accommodations: Those students "must depart the country." Southwell Decl. Ex. C, at 1. Some will return to countries several time zones away, or with inadequate Internet connectivity, or both. The unluckiest of those students will be forced to return to a country affected by civil violence, unrest, or a COVID-19 outbreak even worse than in the United States. Some have no place to go at all.

F-1 students that returned to their home country during the pandemic also face life-altering uncertainty. Although many of them may not be able to return to the United States because of travel restrictions, the July Order senselessly seems to mandate that if their school is offering any in-person instruction, and they do not return, their F-1 Active status will lapse. Such a lapse imposes harsh consequences on those students, including the possibility of losing post-graduate job opportunities, or even (if they cannot re-enter the F-1 program) the opportunity to graduate.

One might have expected that before scuttling the reopening plans of numerous colleges and universities and plunging the lives of countless international students into desperate uncertainty or worse, ICE would have carefully examined the advantages and disadvantages of its action, acknowledged the hardships imposed by its actions, and provided a reasoned explanation of how the benefits of the new policy justify the departure from past practice. But

ICE did nothing of the sort.  To explain its rescission of its March guidance at a moment when "the significant public health concerns associated with the COVID-19 crisis," Southwell Decl. Ex. A, at 1, are at least as salient as they were in March, the July Order says only this: "as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations," Southwell Decl. Ex. C, at 1.

That does not even remotely approach the reasoned explanation that the Administrative Procedure Act ("APA") demands.  It is a fundamental rule of administrative law that agencies must consider the consequences of their actions—both positive *and negative*.  ICE utterly failed to do so.  Indeed, the July Order contains no indication even of *awareness* of the manifold costs and burdens imposed by its abrupt change in course, let alone the careful weighing of those costs against the putative benefits of its new policy.  Instead, ICE has offered only a blithe reference to enforcement of pre-COVID-19 regulations that ICE itself had recognized, in March, needed to be waived in the face of the pandemic.

In any event, Acting Deputy Secretary Cuccinelli has revealed that the true purpose of the July Order's new mandates—issued precisely when many schools were finalizing their plans for the fall semester—is to "*encourage schools to reopen*."  Bowden, *supra* (emphasis added).  But that objective is light years beyond the statutory authority of ICE, and even further from its area of expertise.  It is an entirely inappropriate basis for ICE action, and demonstrates clearly that the July Order must be set aside.  The July Order clearly violates the APA, and this Court should grant Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

### I.    The F-1 Visa Program

Citizens of foreign countries who wish to enter the United States to attend school must obtain a nonimmigrant F student visa.  *See* U.S. Department of State, *Student Visa*,

Travel.State.Gov, https://bit.ly/2ZiwaN0.   First, the student must apply and be accepted to a school certified by the SEVP, which is the Department of Homeland Security program that administers the Student and Exchange Visitor Information System ("SEVIS") and "provides approval and oversight to schools authorized to enroll F . . . nonimmigrant students."   U.S. Immigration and Customs Enforcement, *SEVP Overview*, Student and Exchange Visitor Program (Feb. 6, 2020), https://bit.ly/2Wbpdf0.   "F-1" students are those international students enrolling in elementary, secondary, or post-secondary academic institutions.   U.S. Immigration and Customs Enforcement, *Student Process Steps: How to Navigate the U.S. Immigration System*, Student and Exchange Visitor Program (May 14, 2019), https://bit.ly/329dYHz.

Once a student decides which school to attend, they must complete a Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status."   *Student Visa*, *supra*.   The Form I-20 "is a paper record" of the information in the SEVIS database and includes evidence of the student's financial ability to live and study in the United States.   *Student Process Steps, supra*; Department of Homeland Security, *Financial Ability*, Study in the States, https://bit.ly/2Cv4cod. Once the Form I-20 is complete, the student must pay the I-901 SEVIS fee and apply for and receive a visa.   *Student Visa*, *supra*.

Once at a school in the United States, students with F-1 status must maintain their status by taking and passing a full course of study.   Department of Homeland Security, *Maintaining Status*, Study in the States, https://bit.ly/32mi7bt.   For undergraduates, this typically means taking "at least 12 credit hours per term," while students in post-graduate programs "must take a full course of study as certified by the institution."   *Id.*; *see also* 8 C.F.R. § 214.2(f)(6)(i). Ordinarily, "no more than the equivalent of one class or three credits per . . . term . . . may be counted toward the full course of study requirement if the class is taken on-line or through

distance education and does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class."  8 C.F.R. § 214.2(f)(6)(i)(G). Students with F-1 status are also eligible for optional practical training, a "form of temporary employment that directly relates to [their] program of study," and curricular practical training, employment that is "an integral part of an established curriculum" that directly relates to students' major areas of study.  *Maintaining Status*, *supra*.

International students attending school through the F-1 program make up a significant part of the population of Plaintiffs' student body.  Plaintiff University of Southern California ("USC"), for example, welcomed over 12,000 international students in the fall 2019 term, over 25% of its total enrollment.  Zukoski Decl. ¶ 7.  In 2018, Plaintiff Arizona State University had over 13,400 international students from 136 countries.  *See ASU Is the Top Public University of Choice for International Students*, Ariz. State Univ. (Nov. 13, 2018), https://bit.ly/2CsTEGj. Plaintiff The University of Oregon's student body typically consists of 11–12% international students, Plaintiff Oregon State University's student body consisted of nearly 11% international students in the last Spring term, and a combined over 4,500 Oregon and Oregon State students currently hold F-1 status.  Galvan ¶ 5; Larson Decl. ¶ 11.  Plaintiff Stanford University's international students make up 34% of its graduate students and 11% of its undergraduate students.  Kalfayan Decl. ¶ 6.  And these students are vital contributors to the success of the schools—these students bring intellectual and cultural diversity, engage in cutting-edge research programs, and participate in athletic programs as well.  Galvan Decl. ¶¶ 28–31; Larson Decl. ¶ 31; Gaines Decl. ¶¶ 21, 27; Zukoski Decl. ¶ 30; Kalfayan Decl. ¶ 29.

## II.   Initial Response to COVID-19

COVID-19 is a life-threatening and readily transmitted disease caused by the novel coronavirus, which has posed an increasing and ever-present danger in the United States since

the first case was confirmed in Washington state in January 2020.  The disease spread rapidly

from coast to coast, and on March 13, 2020, President Trump declared the spread of COVID-19

a national emergency.    White House, *Proclamation on Declaring a National Emergency*

*Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020),

https://bit.ly/35x86aT.  The pandemic has interfered with the normal operations of businesses,

educational institutions, and nearly all aspects of daily life.  States and cities across the country

have, and in some cases remain, locked down.    Businesses and courthouses have closed.

International and domestic travel is restricted, and the State Department has urged "American

students overseas" to "return to the United States as soon as possible" because of "unpredictable

circumstances" and "[in]adequate health care" abroad.  U.S. Dep't of State, *COVID-19 Traveler*

*Information* (Apr. 7, 2020), https://bit.ly/2ZkALy9.  The pandemic has only worsened since the

President declared a national emergency:  The number of confirmed cases and deaths in the

United States from COVID-19 have grown exponentially, from 1,600 cases and 46 deaths in

March to 3.1 million cases and 133,000 deaths on July 12.  Ctrs. for Disease Control &

Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the US* (last visited July 12, 2020),

https://bit.ly/2SyyE6k.

### A.    The March Order

In the wake of the COVID-19 outbreak, the federal government recognized that many

schools could reduce their students' risk of contracting COVID-19 by teaching students

remotely.    On March 9, 2020, the SEVP division of ICE issued a guidance document

acknowledging that "schools may need to adapt their procedures and policies to address the

significant public health concerns associated with the COVID-19 crisis."  Southwell Decl. Ex. A

(the "March Order").  ICE stated that it "intend[ed] to be flexible with temporary adaptations"

because the "COVID-19 crisis is fluid and rapidly changing."    *Id.*    In particular, ICE

"recognize[d] that schools are updating their emergency operations plans to minimize the potential impact of COVID-19 on the school," including by "provid[ing] online instruction." *Id.* at 3.

Four days later, ICE issued another guidance document to address the status of students whose schools "stop[ped] in-person classes" but would "offer[ ] online instructions." Southwell Decl. Ex. B. "Given the extraordinary nature of the COVID-19 emergency," ICE exempted F-1 students from the rule that they must attend most classes in person. *Id.* In other words, F-1 students could remain in the United States and retain their F-1 status, even though virtually all schools had transitioned to a purely remote curriculum for the duration of the Spring semester. Sensibly, ICE assured this exemption would remain "in effect for the duration of the emergency." *Id.*

## B.    Plaintiffs' COVID-19 Response

Meanwhile, Plaintiffs sprang into action as well. Several Plaintiffs organized emergency response teams to monitor the pandemic and make quick decisions about how best to protect students. Zukoski Decl. ¶ 11; Kalfayan Decl. ¶ 12. These teams sought input from public health leaders, conducted surveys, organized town halls and small group discussions, and held regular meetings to respond to the rapidly evolving situation. Zukoski Decl. ¶ 13; Kalfayan Decl. ¶ 14. These teams also collaborated with the various academic departments, laboratories, and other facilities involved in providing educational instruction to Plaintiffs' students. Zukoski Decl. ¶ 16; Kalfayan Decl. ¶ 14.

In or around the middle of March, Plaintiffs began to announce they would be suspending in-person instruction, at least temporarily. Zukoski Decl. ¶ 19; Larson Decl. ¶ 21; Kalfayan Decl. ¶ 17. Schools in California and Oregon were thereafter ordered closed by order of state and local authorities, dictating that all instruction for the remainder of the spring term be

conducted online.  Zukoski Decl. ¶ 20; Kalfayan Decl. ¶ 19.

After addressing the initial crisis and the spring term, Plaintiffs turned their attention to preparations for the fall.  Planning for the fall, particularly in light of the changing circumstances, involved significant resources and deliberation.  Galvan Decl. ¶¶ 8–13, 19–22; Larson Decl. ¶¶ 13–18, 21–23, 26–27; Zukoski Decl. ¶ 21; Kalfayan Decl. ¶¶ 12–16, 28.  Over the past several weeks, Plaintiffs and other colleges and universities have begun to roll out their plans for the fall.  Tailoring their plans to the particular needs of their students, faculty, and staff, and their campus environments, Plaintiffs have taken a variety of approaches as they invite students to return to campus:

- The University of Oregon announced its plan to conduct classes with fewer than fifty students, and conduct classes with more than fifty people either remotely or with only small-group discussion in person, with in-person classes ceasing after the Thanksgiving break (Galvan Decl. ¶ 21);

- Oregon State University announced its plan to offer at least 50% of its courses for remote instruction, providing in-person instruction only in classrooms with double capacity for class enrollment, and with in-person classes likely ceasing after the Thanksgiving break (Larson Decl. ¶¶ 24–25);

- USC announced its plan to offer approximately 10–20% of its classes in person, principally those involving hands-on work (Zukoski Decl. ¶ 22);

- Stanford University announced its plan to invite only half of its undergraduate students back (divided by class year) during each of its four academic quarters, although it will not compel any of its students to return if they elect not to (Kalfyan Decl. ¶¶ 21–22).

Because in-person course offerings are limited under these hybrid approaches, many students are expected to take a fully remote or online schedule of classes in order to make sufficient academic progress in their chosen field of study.  Larson Decl. ¶ 24; Zukoski Decl. ¶ 22.

Other Plaintiffs, however, made the difficult decision not to invite students back to campus.  For example, on July 8, 2020, Plaintiff Pomona College announced in a letter to its community that in light of the severe restrictions that would have to be implemented and the

ongoing public health crisis, its fall curriculum would be offered entirely online.  Gaines Decl. ¶ 16.

### III.   The July Order And Its Effects

#### A.  ICE Reverses Course

With no prior notice, on July 6, 2020, ICE abruptly rescinded its March guidance.  ICE now has directed that "[s]tudents attending schools operating entirely online may *not* take a full online course load and remain in the United States."  Southwell Decl. Ex. C, at 1.  Students "currently in the United States enrolled in such programs must depart the country or take other measures" to maintain their F-1 status, or else "potentially face immigration consequences" such as "the initiation of removal proceedings."  *Id.*  Students attending schools adopting a "mixture of online and in person classes," meanwhile, also cannot "tak[e] an entirely online course load for the fall 2020 semester."  *Id.*  And "[i]f a school changes its operational stance mid-semester" and "switches to only online classes" (perhaps because of a government-ordered closure of campus), F-1 students "must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction."  *Id.* at 2.  The July Order does not provide any insight as to how a student might possibly transfer to a new school mid-semester in the midst of a pandemic.

ICE also issued directives to schools.  Schools whose classes would be entirely online in the fall "*must* complete [and submit] an operational change plan" by July 15, 2020—nine days after ICE's announcement.  Southwell Decl. Ex. C, at 2.  Those schools that propose to provide a mix of online and in-person classes must update and submit "operations plans by August 1, 2020."  *Id.* at 2–3.  Moreover, ICE directed schools to update and reissue a new Form I-20—the certificate of eligibility for nonimmigrant student status—for each of their thousands of F-1 international students by August 4, 2020.  *Id.* at 2.

ICE offered only a single sentence to explain its change in policy: "There will still be accommodations to provide flexibility to schools and nonimmigrant students but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations."  Southwell Decl. Ex. C, at 1.  The July Order includes no other explanation for the policy change, and no discussion whatsoever concerning the effects of the new policy on Plaintiffs or their students.

### B.    The Fallout From ICE's Reversal

The July Order immediately imposed severe new burdens on Plaintiffs—institutions already deeply stressed by the pandemic.  For starters, because of the Order's new requirement that F-1 students remaining in the United States attend at least some in-person courses, Plaintiffs have had to divert resources to ensure that enough in-person courses will be offered for all F-1 students, lest those students be deported.  Galvan Decl. ¶ 26; Larson Decl. ¶ 30; Gaines Decl. ¶¶ 20, 22; Zukoski Decl. ¶ 29; Kalfayan Decl. ¶¶ 30, 33.  The July Order also imposed immediate and direct compliance costs on Plaintiffs.  Plaintiffs, like Pomona College, that initially planned to conduct only online courses in the fall must, if they adhere to that plan, file an "operational change plan" by July 15.  Southwell Decl. Ex. C, at 2.  Other schools have until just August 1 to do so.  *Id.* at 2–3.  And all schools offering courses to F-1 students are required to issue a new Form I-20 for thousands of international students by August 4, 2020.

F-1 students, of course, also face direct consequences from the July Order.  For those attending schools that plan to offer only online instruction in the fall, these students must either depart the United States, or attempt to transfer to another school just a few weeks before the term begins.  Those forced to return to their home countries face a variety of challenges to continuing their education, including the costs of breaking leases and relocating, lack of reliable Internet access, or unstable political and cultural environments.  Galvan Decl. ¶¶ 39, 40, 42, 43; Larson

Decl. ¶¶ 38, 45, 46, 50, 51; Gaines Decl. ¶¶ 26, 33; Zukoski Decl. ¶¶ 38, 43, 47; Kalfayan Decl. ¶¶ 46–48.

Those F-1 students that returned home abroad during the pandemic also face uncertainty. The July Order is not completely clear as to whether students remaining abroad and attending virtual courses will lose their F-1 status, but if they do, that deprivation will have serious consequences for those students. Many of them may not have the resources to reapply for the F-1 visa program. Galvan Decl. ¶ 41; Larson Decl. ¶ 47; Gaines Decl. ¶ 32; Zukoski Decl. ¶ 45. Others may lose post-graduate job opportunities available only to those students engaged in a continuing academic program pursuant to the F-1 program. Galvan Decl. ¶ 33; Larson Decl. ¶ 43; Gaines Decl. ¶ 28; Zukoski Decl. ¶ 42.

## LEGAL STANDARD

The Court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Where the district court reviews an administrative action pursuant to the APA, summary judgment is an appropriate mechanism for deciding the purely legal question of whether the agency could have reasonably reached the decision that it did." *Or. Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037, 1047 (D. Or. 2014).

## ARGUMENT

The APA requires a court to vacate agency action where the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The July Order is arbitrary and capricious and not in accordance with law for two reasons: (1) the July Order fails to satisfy the minimum standards for reasoned decision making, and (2) the proffered reason in the July Order is pretextual. For these reasons, the July Order must be held unlawful, vacated, and set aside.

## I.    The July Order Is Final Agency Action

There is no question that the July Order is final agency action—it plainly bears "all of the hallmarks of APA finality." *Sackett v. EPA*, 566 U.S. 120, 126 (2012).  It determines the rights of F-1 students studying in the United States, and imposes legal obligations on Plaintiffs to make submissions and issue Forms I-20.  *See id.*  And plainly "legal consequences" flow from the July Order, because it declares that F-1 students who violate its instructions will be subject to deportation.  *See id.*; *see also* Southwell Decl. Ex. C, at 1.  While ICE promises to publish a "Temporary Final Rule" in the Federal Register, Southwell Decl. Ex. C, at 1, it has not yet done so, despite demanding that schools provide responses to the Order as soon as July 15.  An agency cannot demand immediate action from regulated parties and simultaneously claim that its orders are merely interim.  *Cf. Bennett v. Spear*, 520 U.S. 154, 178 (1997) (agency action is not final if it is merely "tentative" or "interlocutory" (quotation marks omitted)).  The July Order therefore is final agency action and it is subject to vacatur under the APA.

## II.    The July Order Is Not The Product Of Reasoned Decision Making

### A.  ICE Failed To Consider The Harms Arising Out Of The July Order

Before taking final action, an agency must "examine the relevant data" and "consider[] . . . the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  This means the agency must "pay[] attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).  Moreover, when the agency reverses a preexisting policy, it must take into account "serious reliance interests" arising out of the preexisting policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quotation marks omitted).

Just weeks ago, the Supreme Court reaffirmed and applied these fundamental rules in *Department of Homeland Security v. Regents of University of California*, 140 S. Ct. 1891 (2020).

There, the Court vacated as inconsistent with the APA the Department of Homeland Security's attempted rescission of the Deferred Action for Childhood Arrivals ("DACA") program on the ground that, among other things, the Acting Secretary "failed to address whether there was 'legitimate reliance' on the DACA Memorandum." *Id.* at 1913. The Court proceeded to detail the substantial harm caused by the abrupt rescission of DACA—the harm to DACA recipients who had started businesses and purchased homes, the harm to the families of DACA recipients, and the detrimental economic effects caused by a mass exodus of a considerable portion of the U.S. workforce. *See id.* at 1914. Although those costs and reliance interests did not necessarily foreclose the rescission of DACA, the Department of Homeland Security was required at least to consider them. *See id.*

ICE, apparently, did not get the message. Despite acknowledging in March that "SEVP-certified schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis," Southwell Decl. Ex. A, at 1, the July Order contains no recognition of that need, nor does it consider the harm of imposing a "one-size-fits-all" program on hundreds of different schools—each with its own student body and campus environment and unique struggles in grappling with the pandemic—with so little time before the start of the next semester. The July Order also fails entirely to consider the "legitimate reliance," *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996), that schools placed on the March Order, notwithstanding that the March Order indicated the exemption would be "in effect for the duration of the emergency," Southwell Decl. Ex. B, at 1, and that the national emergency declared on March 13 has not yet been lifted. ICE thus failed entirely to acknowledge, address, or weigh at least three broad categories of harm arising out of the July Order:

1.    The July Order imposes costs on schools by requiring them to restructure their fall academic programming to ensure F-1 students have adequate in-person classes.  Plaintiffs have invested substantial resources in the past several months to develop academic plans for the fall that meet the needs of their students without compromising the health of their students, faculty, or staff.  Galvan Decl. ¶¶ 7–15, 19; Larson Decl. ¶¶ 13–18, 23, 27, 30; Gaines Decl. ¶¶ 7–12; Kalfayan Decl. ¶¶ 12–15.  Those plans are the result of voluminous input by professors, administrators, state government officials, and health professionals, and represent Plaintiffs' considered judgment about how best to serve the interests of their numerous stakeholders. Galvan Decl. ¶¶ 9, 22; Larson Decl. ¶¶ 14–18, 30; Gaines Decl. ¶¶ 9–13, 18; Kalfayan Decl. ¶¶ 28, 53.

The July Order throws all of that into disarray.  Instead of spending the coming weeks refining and implementing their plans to strive to provide a safe and enriching educational environment for their students in the fall, Plaintiffs instead must redirect those resources to attempting to do what they can to protect their international students from deportation under the July Order in order to preserve those students' many, varied, and invaluable contributions to their institutions.   Galvan Decl. ¶ 26; Larson Decl. ¶ 30, 37–38; Gaines Decl. ¶¶ 20–24; Kalfayan Decl. ¶ 31.  This costly reallocation of resources adds to the already daunting task of preparing large-scale academic institutions for an unprecedented term of uncertainty and experimentation.

The July Order also imposes direct costs of compliance on Plaintiffs.  It requires schools that plan to offer only online classes for the fall 2020 term to submit an "operational change plan" by July 15—just nine days after the July Order was issued.  Southwell Decl. Ex. C, at 2. Those schools that, like many of Plaintiffs, are offering in-person classes or a hybrid of in-person and remote classes have until just August 1 to submit their operational plans.  *Id.* at 2–3.  And the

July Order further requires schools to issue a new Form I-20 for *thousands* of students by August 4, 2020, an immensely burdensome task that not only ordinarily takes several months, Galvan Decl. ¶ 33; Larson Decl. ¶¶ 34–37; Gaines Decl. ¶¶ 24–25, but also is literally impossible for those schools that will not have even completed enrollment by that time, Gaines Decl. ¶ 25. The development of those plans for submission to ICE, particularly on such a truncated timeframe, is a costly and disruptive process that, once again, detracts from Plaintiffs' core educational missions. Galvan Decl. ¶ 33; Larson Decl. ¶ 38.

And it is not just the Plaintiffs' resources that are compromised, but also their ability to offer academic programming of their own choice to best meet their students' needs. Plaintiffs have planned for and prepared to implement a wide variety of course offerings designed to maximize the educational experience for their students, even in these challenging times. Each Plaintiff is responding in its own way—some schools are operating mostly or entirely online, others are offering principally "hybrid" courses that are taught partially online and partially in person, and others are offering a mixed semester, with in-person classes ceasing after Thanksgiving break. Galvan Decl. ¶¶ 19–22; Larson Decl. ¶¶ 24–25; Gaines Decl. ¶ 16.

The July Order deprives schools of their ability to tailor their academic programming to the needs of their students. While each of Plaintiffs remains committed to offering all of their students a valuable and positive educational experience, the reality is that ensuring that all international students are enrolled in in-person courses impedes the fulfillment of that mission. Plaintiffs' ability to offer in-person classes is constrained both by the relatively small number of facilities that can accommodate social distancing protocols, and the faculty that are available to teach in-person classes. And a faculty member or facility allocated to a course offering created to satisfy the July Order's new requirement cannot be utilized for another in-person class. In this

way, the July Order is forcing Plaintiffs to change their course offerings and ultimately places new limitations on the choices Plaintiffs' students have in selecting their coursework.

      **2.**      F-1 students currently residing in the United States will be directly harmed in a variety of ways.  Most critically, for those schools like Plaintiff Pomona College that have planned to offer *only* online instruction, unless they dramatically alter their plans, all of their F-1 students now face a choice:  They can attempt to transfer to another school offering in-person courses, or they will be forced to leave the United States and attempt to continue their coursework from another country.  Gaines Decl. ¶ 19.[1]

      Yet even students of those Plaintiffs that currently plan to offer some in-person instruction to international students face paralyzing uncertainty.  That is because the July Order warns, ominously, that "[i]f a school changes its operational stance mid-semester"—which is to say, if schools once again are forced to close their campuses and move all instruction online as they were in March—all of their F-1 students "must leave the country or . . . transfer to a school with in-person instruction."  Southwell Decl. Ex. C, at 3.  Even if a mid-semester school transfer theoretically were possible (for a variety of reasons, it generally is not), it would be completely out of the realm of possibility in the event of another broad closure of campuses as occurred in March.  The only option would be to leave the country.

      The breadth of harms that would flow from such an abrupt exodus of F-1 students is difficult to overstate:  F-1 students would be compelled immediately to uproot their academic and personal lives, and attempt to continue their studies from abroad, for some several time

---

[1]  Universities have standing to assert the "rights of the students, scholars, and faculty" affected by Executive action.  *See Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017).

zones away from their instructors, for others without reliable Internet access, for some in places experience civil unrest or violence or a COVID-19 outbreak worse even than that which has befallen the United States.  Galvan Decl. ¶¶ 40, 42; Larson Decl. ¶¶ 46, 50; Gaines Decl. ¶¶ 30–32; Kalfayan Decl. ¶ 47.  The harms from these situations range from the direct economic costs of having to break leases and relocate thousands of miles away, Galvan Decl. ¶¶ 34–35, 42; Larson Decl. ¶¶ 38, 50; Gaines Decl. ¶¶ 26, 32.d, 33, to interrupted academic research, to more poignant family traumas of pulling children out of school and attempting to find caretakers for family pets, *see* Cascante Decl.; Memiaghe Decl.; Yang Decl..

Whether it happens immediately because a Plaintiff offers only online courses, or it happens midway through the term after a school is forced to close its doors, the loss of international students deeply compromises Plaintiffs' ability to fulfill their educational mission. Courts have long recognized that schools have a legitimate interest in encouraging the sharing of diverse viewpoints and cultures.  *See Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) (a university's "educational judgment that such diversity is essential to its educational mission is one to which we defer").  International students bring tremendous value to the intellectual and intramural community at each of Plaintiffs, offering varied perspectives and interests.  Galvan Decl. ¶¶ 28–30, 38–39; Larson Decl. ¶¶ 31, 45; Gaines Decl. ¶ 21; Kalfayan Decl. ¶ 5, 29, 32. The effective expulsion of F-1 students from the United States would impair Plaintiffs' ability to offer an environment where diverse viewpoints are shared, instead restricting the student body only to domestic students and those international students fortunate enough to be able to attend school courses online from their home countries despite the logistical challenges.  Galvan Decl. ¶ 28.  The departure of large numbers of international students would run counter to the core mission of many of Plaintiffs, who strive to provide a diverse and engaging learning environment

for all students, and who depend on international students to enrich the experience of their peers. Galvan Decl. ¶¶ 28–29, 44–45, 47; Larson Decl. ¶ 31.

The July Order also poses a related and particular problem for those F-1 students at increased risk for severe illness from COVID-19.  While Plaintiffs have carefully designed reopening plans that minimize health risks to the student population, no amount of precautions can completely eliminate the risk of contracting COVID-19.  And that risk is more substantial for those individuals with certain medical conditions that may lead to a higher chance of severe illness due to COVID-19.  *See Coronavirus Disease 2019 (COVID-19); People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (June 25, 2020), https://bit.ly/3gO6spB.  Those medical conditions range from kidney disease, to asthma, to high blood pressure, to pregnancy.  *See id.*  While Plaintiffs would otherwise be willing to accommodate F-1 students at higher risk of severe illness from COVID-19 through the provision of an online-only curriculum, they effectively are prohibited from doing so by the July Order, unnecessarily increasing the risk to those students with no apparent or stated purpose.  Such students are put to the dilemma of either risking exposure to COVID-19 in in-person classes, or risking exposure to COVID-19 on an ICE-mandated international flight.

These harms are not hypothetical, and certainly not abstract to the very real students whose lives may be transformed by virtue of the July Order.  The stories of just a tiny fraction of those affected students are set forth in the declarations, including:

- One University of Oregon student faces the prospect of returning to Indonesia, where they will lack access not only to reliable Internet, but even to clean tap water.  Galvan Decl. ¶ 39.a.

- One Pomona College student is a citizen of a country other than her family's current country of residence.  Because her family's country of residence has closed its borders to short-term visitors she would have no place to live if required to leave the United States.  Gaines Decl. ¶ 33.b.

- Another Pomona College student from an African nation would have to return to a country with no reliable Internet, and would potentially lose the significant financial aid she receives from the school.  Gaines Decl. ¶ 33.a.

- One Oregon State University student came to the United States fleeing an abusive relationship in her home country, and fears for her life if forced to return home. Larson Decl. ¶ 51.a.

- Another Oregon State University student is in graduate school and, even if they could return home, would lack access to reliable Internet access and could not access resources—including frequent contact with their research advisor and specialty academic committee—needed to continue their education.  Larson Decl. ¶ 51.g.

**3.**     F-1 students currently residing outside of the United States and unable to return are harmed as well.  These students face challenges different from their peers that remained in the United States.  Even though most Plaintiffs are willing and able to offer at least some in-person courses, many F-1 students simply are unable to return to the United States.  That may be for any number of reasons, including prohibitively expensive flights, travel restrictions, or simply a legitimate fear that international travel will jeopardize their health.

The fate of these students is unclear under the July Order.  The July Order states that continuing F-1 students outside of the United States "whose schools of enrollment are *only* offering online classes, may remain in Active status in SEVIS if they are taking online courses and are able to meet the normal full course of study requirements or the requirements for a reduced course of study."  Southwell Decl. Ex. C, at 2.  This suggests that F-1 students outside of the United States attending a school that offers only *some* online courses will *not* remain in Active status.  But ICE's "Frequently Asked Questions" regarding the July Order, released on July 7, states that "continuing F and M students may remain in Active SEVIS status while studying online, outside the United States."  *Frequently Asked Questions for SEVP Stakeholders About Guidance for the Fall 2020 Semester*, U.S. Immigration & Customs Enforcement 3 (July 7, 2020), https://bit.ly/3fkAIYN.  The apparent disconnect between these two messages not only

heightens the confusion surrounding the July Order, but further demonstrates the lack of deliberative or reasoned decision making by ICE.

Taking the July Order at its word (without reference to the seemingly contradictory July 7 guidance) that F-1 students abroad enrolled only in online courses at a school that offers some in-person instruction for stateside students will lose their F-1 Active status, two significant harms will flow from that policy.  First, once students lose their F-1 status, it will be challenging for them to regain it.  U.S. consular offices remain closed for routine visa appointments, and even when they reopen, the visa application process is time consuming, burdensome, and costly, particularly for those F-1 students who have to travel significant distances to consular offices. Galvan Decl. ¶ 41; Larson Decl. ¶ 47; Gaines Decl. ¶ 31.  There is thus no certainty that these students will be able to reapply for and reenter the F-1 visa program once they are removed from Active status.

Second, certain post-graduate employment programs may become unavailable to those students who have a lapse in their F-1 status.  F-1 students are eligible to participate in "practical training" programs, either during their course of study or immediately after completion.  *See* 8 C.F.R. § 214.2(f)(10).  These programs are available only to F-1 students who have "been lawfully enrolled on a full-time basis, in a Service-approved college, university, conservatory, or seminary for one full academic year."  *Id.*  For "optional practical training"—or OPT— post-graduate participation is permitted only if the OPT is completed within a 14-month period (with some exceptions).  *See id.* § 214.2(f)(10)(ii)(A)(3).  The practical effect of all of this is that F-1 students who wish to participate in these programs must either be currently enrolled in a school pursuant to F-1 for at least one year, or must have recently completed a full course of study.  An interruption in students' F-1 status can temporarily disqualify students for

participation in the program, and may permanently disqualify them if they complete their course studies while not enrolled in the F-1 visa program. The July Order thus could actually F-1 students abroad of opportunities to undertake work opportunities in the United States relevant to their field of study.

* * *

The import of the above is that ICE *must*, as a matter of fundamental administrative law, consider and weigh the relevant harms and costs arising from its decision to rescind the March Order. And ICE failed completely to do so. Nowhere in the July Order did ICE even acknowledge, much less analyze, the substantial harms that the July Order will cause. ICE did not address the fact that its onerous and unreasonable deadlines for schools to restructure their academic programs imposes direct compliance costs on Plaintiffs and those similarly situated to them. It did not acknowledge that schools, in designing their plans for the fall semester, relied on ICE's statement that the March guidance of "flexibility" would remain in place "for the duration of the emergency." Southwell Decl. Ex. B, at 1. Nor did ICE acknowledge the many harms its new policy portends for F-1 students. ICE's "Frequently Asked Questions" released on July 7 suggests that F-1 students enrolled only in online classes simply "do not need to be present" in the United States. But ICE seems to have overlooked entirely that many of these students very much do "need" to take the classes best suited for their academic progress; "need" to not be several time zones away from their instructions; "need" not to break their lease obligations; "need" to keep their children in school; and "need" to keep their families together. ICE apparently considered none of that. That is not reasoned decision making, and it cannot sustain the agency action taken here. The July Order therefore must be vacated under the APA.

### B. The July Order Offers No Reasoned Explanation At All

Although an agency is free to change a preexisting policy, it must "display awareness that it *is* changing position" and "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency action therefore cannot be sustained if "[t]here are no findings and no analysis . . . to justify the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962), and vacatur is appropriate if "the agency's explanation is, in effect, no explanation at all," *All. for Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1114 (9th Cir. 2018); *see also Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (vacatur appropriate where "an agency provides no explanation at all for a change in policy").

The entire "rationale" offered by the July Order is set forth in a single sentence in the introductory paragraph: "There will still be accommodations to provide flexibility to schools and nonimmigrant students but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations." July Order at 1. The July Order does not say what those "carefully balanced protections" are, and more critically, it does not explain why the fact that many schools now are attempting to reopen, mostly with hybrid plans, counsels in favor of abandoning ICE's prior policy giving schools flexibility to meet the varying unprecedented scenarios posted by the pandemic. *See Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (vacating agency action where the agency "offered no explanation for why it exercised its discretion to select one [option] rather than the other").

Indeed, all of the proffered reasons for ICE's prior policy of permitting F-1 students to maintain their visa status while taking a fully online curriculum apply today with at least as much force as they did in March. When ICE promulgated the March Order, it highlighted the need for

the exemption in light of the "extraordinary nature of the COVID-19 emergency," and advised that the exemption would remain "in effect for the duration of the emergency." March Order at 1. President Trump declared a national emergency on March 13, 2020, *see* White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/3ffGlaK, and that declaration has never been rescinded or revised.

Meanwhile, the pandemic is far from over. There are now a total of 3,106,931 confirmed cases of COVID-19 in the United States, with approximately 60,000 new cases *each day*—far higher than the 267 new cases detected on March 13, 2020. *See Coronavirus Disease 2019 (COVID-19), Cases in the US*, Ctrs. for Disease Control & Prevention (last visited July 11, 2020), https://bit.ly/301213T. And there are currently approximately 800 new deaths each day. *Id.* This disturbing uptick cannot be attributed solely to increased testing—the percentage of positive tests has nearly doubled from a nadir of 4.3% in early June to 8.3%. *See Rate of Positive Tests in the US and States Over Time*, Johns Hopkins Univ. of Med. (last visited July 11, 2020), https://bit.ly/301h4uE. In short, things have gotten worse, not better, since ICE announced the exemption in the March Order.

While administrative agencies have latitude to determine the best response to changing circumstances, ICE was required to at least state its reasons for reversing its prior policy and explain how changed facts or circumstances justify the new approach. But the stubborn fact that the COVID-19 pandemic rages on and schools are doing their level-best to meet the challenge of safely educating students in this unprecedented environment demonstrates only the need for more flexibility, not less. The fact that some schools today are attempting to reopen amidst the pandemic hardly presents no rational justification for pulling the rug out from under hundreds of

thousands of F-1 students and the schools that serve them.  ICE was required to, at the very least,

offer *some* reasoned explanation for its dramatic about face.  It failed to do so, and for that reason

alone, the July Order violates the APA and must be vacated.[2]

### III.    The Proffered Reasons For The July Order Are Pretextual

Even crediting ICE's perfunctory justification for its action, the July Order is also

defective under the APA because the proffered reasons for ICE's actions do not reflect the

agency's actual reasoning.

Effective judicial review of agency action is impossible unless the agency discloses the

basis for its action.  *See Burlington Truck Lines*, 371 U.S. at 167–68.  For that reason, agency

action may not properly rest on a "pretextual basis."  *Dep't of Commerce v. New York*, 139 S. Ct.

2551, 2573 (2019).  Thus, vacatur under the APA is appropriate where there is "an explanation

for agency action that is incongruent with what the record reveals about the agency's priorities

and decisionmaking process."  *Id.* at 2575.

---

[2]    In a "Frequently Asked Questions" document published the day after the July Order, ICE
opines that the July Order "minimiz[es] the risk of transmission of COVID-19 by not
admitting students into the country who do not need to be present to attend classes
in-person."  *Frequently Asked Questions*, *supra*.  "[J]udicial review of agency action is
limited to the grounds that the agency invoked when it took the action," *Dep't of Homeland
Sec.*, 140 S. Ct. at 1907–08 (quotation marks omitted), and so the agency cannot invoke this
rationale to justify the July Order.  In any event, the "Frequently Asked Questions" document
suggests no reason to believe that F-1 students that have been in the United States since
March present any enhanced "risk of transmission of COVID-19," or that their removal
somehow reduces the risk to others.  To the extent ICE would limit this rationale to persons
seeking to return to the United States, it suggests no reason to believe that F-1 students pose
an enhanced risk vis-à-vis other travelers from the same country.  If the United States is
admitting travelers from Canada, it makes no sense to exclude Canadian students who have a
fixed place of residence in the United States.  And there is no indication ICE examined the
many disadvantages to international students in compelling them to pursue their academic
program from school.  *See supra*.

In the July Order, ICE indicated that the reopening of some schools necessitates the "resum[ption of] the carefully balanced protections implemented by federal regulations." Southwell Decl. Ex. C, at 1. Whatever this opaque statement may mean, *see supra*, it plainly does not reflect the true rationale for the policy change: To encourage—or perhaps to coerce—schools into offering in-person classes in the fall, even against the advice of public health professionals and contrary to the months-long deliberative processes undertaken by individual schools to determine the best options for their communities.

The agency's true intent was revealed by Acting Deputy Secretary of Homeland Security Ken Cuccinelli, who, when pressed by a reporter, seemed to acknowledge that the purpose of the policy was to "encourage schools to reopen." John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will "Encourage Schools to Reopen"*, The Hill (July 7, 2020), https://bit.ly/303vFG2. Specifically, he explained, "This is now setting the rules for one semester, which we'll finalize later this month that will, again, encourage schools to reopen." *Id.* This statement aligns with repeated calls by the President for schools to reopen in the fall, sometimes accompanied by threats to cut off federal funding. *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (July 10, 2020, 7:41 AM) (". . . Schools must be open in the Fall. If not open, why would the Federal Government give Funding? It won't!!!"); Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020, 2:40 PM) ("SCHOOLS MUST OPEN IN THE FALL!!!").

These statements explain why ICE's contemporaneous explanation for its policy reversal is so lacking: The true motive behind ICE's action is to strong-arm schools into opening prematurely in the fall so as to further ideological political interests. While political motives are not in and of themselves impermissible bases for agency action, *see Dep't of Commerce*, 139 S.

Ct. at 2573, an agency may not disguise those motives under the guise of legitimate policy objectives, *see id.* at 2575–76.   And such a rationale for upending the lives of F-1 students is both unlawful and dangerous:  It is unlawful because ICE has *no* statutory authority or expertise to make nuanced determinations balancing public health against educational needs.   *Cf. Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 552 (D.C. Cir. 2015) (agencies must proceed cautiously when acting in an area where they have "no particular expertise").   And it is dangerous because it assumes that a fall reopening is an optimal policy for all schools, regardless of their particular circumstances or the current state of the pandemic in their geographical area.   The President's threat of withholding federal funds to coerce schools into opening, even against their better judgment, demonstrates the arbitrary and irrational basis for ICE's action and underscores the pretextual nature of the July Order.

This Court should not permit ICE to threaten the academic future of thousands of international students and the academic strength and reputation of Plaintiffs if the agency is unable or unwilling even to openly state the true rationales for its change in course.  The July Order is a dangerous effort to achieve political goals by bludgeoning schools into a course of action that may directly conflict with public health guidance and directives.  Not only did ICE fail in its administrative law obligation to disclose the true purpose for its actions, but it also has greatly overstepped its own authority.  The APA demands much more, and this Court should find the July Order is unlawful and grant Plaintiffs' Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and vacate and set aside the July Order.

DATED:  July 13, 2020

GIBSON, DUNN & CRUTCHER LLP

Debra Wong Yang (*pro hac vice forthcoming*)
  dwongyang@gibsondunn.com
Ethan Dettmer (*pro hac vice forthcoming*)
  edettmer@gibsondunn.com
Theane Evangelis (*pro hac vice forthcoming*)
  tevangelis@gibsondunn.com
Chelsea Mae Thomas (*pro hac vice forthcoming*)
  cthomas@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Phone: (213) 229-7000

Theodore B. Olson (*pro hac vice forthcoming*)
  tolson@gibsondunn.com
Matthew D. McGill (*pro hac vice forthcoming*)
  mmcgill@gibsondunn.com
Joshua Wesneski (*pro hac vice forthcoming*)
  jwesneski@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Phone: (202) 955-8500

Alexander H. Southwell (*pro hac vice forthcoming*)
  asouthwell@gibsondunn.com
Oliver Fong (*pro hac vice forthcoming*)
  ofong@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

*Attorneys for Plaintiffs*

 /s/ *Kevin S. Reed*

Kevin S. Reed (OBN #160574)
  ksreed@uoregon.edu
Douglas Y.S. Park (OBN #980904)
  dougpark@uoregon.edu
Jessica Price (OBN #182104) (*LR 83-4 pending*)
  jgprice@uoregon.edu
University of Oregon
Office of General Counsel
1226 University of Oregon
Eugene, OR  97403
Phone: (541) 346-3082

Rebecca Gose (OBN #105712)
  rebecca.gose@oregonstate.edu
Julie Penry (OBN #053440)
  julie.penry@oregonstate.edu
Whitney Hill (OBN 093849)
  whitney.hill@oregonstate.edu
(*Special Admission as Government Attorneys pending*)
Oregon State University
Office of the General Counsel
630 Kerr Admin Bldg
Corvallis, OR  97331
Phone: (541) 737-2474

Beong-Soo Kim (*pro hac vice forthcoming*)
  bkim@usc.edu
Laurie Barnes (*pro hac vice forthcoming*)
  lbarnes@usc.edu
Andreas Meyer (*pro hac vice forthcoming*)
  andreasm@usc.edu
University of Southern California
Office of the General Counsel
3551 Trousdale Parkway, ADM 352
Los Angeles, CA  90089-5013

*Attorneys for Plaintiffs*

## **Certificate of Compliance**

This brief complies with the applicable word-count limitation under Local Rule 7-2(b) because it contains fewer than 35 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED:  July 13, 2020                      /s/ *Kevin S. Reed*_____
                                           Kevin S. Reed (OBN #160574)

                                           *Attorney for Plaintiffs*

## Certificate of Service

I hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants. This document is being sent by express mail to the Defendants at the addresses below and by email.

United States Department of Homeland Security
2707 Martin Luther King Jr. Ave., S.E.
Washington, D.C.  20528

United States Immigration and Customs Enforcement
500 12th St., S.W.
Washington, D.C.  20536

Chad F. Wolf
Acting Secretary of Homeland Security
United States Department of Homeland Security
2707 Martin Luther King Jr. Ave., S.E.
Washington, D.C.  20528

Matthew Albence
Acting Director of United States Immigration and Customs Enforcement
United States Immigration and Customs Enforcement
500 12th St., S.W.
Washington, D.C.  20536

DATED:  July 13, 2020                    /s/ *Kevin S. Reed*
                                                  Kevin S. Reed (OBN #160574)

                                                  *Attorney for Plaintiffs*